Green, Judge,
delivered the opinion of the court:
Plaintiff in this case, an Indian tribe, asks judgment, against the defendant for $62,000,000 as damages “ for violation of the rights of the plaintiff.” The petition shows that damages are sought to be recovered by reason of the defendant having appropriated certain lands to which it is alleged plaintiff had title, and a further claim is made on account of destruction of game alleged to have been wrongfully permitted by defendant on this land. Jurisdiction is conferred' by two jurisdictional acts of Congress which authorize the court to award the plaintiff any damages which it may have sustained by wrongful appropriation of its land and also to set off against such damage any sum or sums paid or expended for the benefit of the Indians. These acts are too long to be set out in the opinion. They can be found in the plaintiff’s petition and in the findings of fact. As counsel for the respective parties do not agree as to the force and effect of these acts, it will be necessary to determine the construction thereof before applying them.
The plaintiff claims to have held title by “immemorial, possession ” to a large tract of land lying north of the Missouri River and between it and Canada, which will be more particularly described hereinafter. It further claims title *363 to a large tract south of the Missouri River which was ceded to it by the Treaty of Fort Laramie made in 1851 and also claims to have had title to this land by “ immemorial possession.” The description of this land will be hereinafter set out. The plaintiff contends that the second jurisdictional act is so worded that the defendant has thereby recognized that the plaintiff tribe had certain lands to which it held title by “ immemorial possession.” Another contention made by the plaintiff is in effect that not all of the payments made by the defendant for the benefit of the plaintiff tribe can be offset against damages which may be awarded, particularly if awarded by reason of the appropriation of the Fort Laramie lands. This second contention will be discussed when the matter of the amount of credits to which the Government is entitled is reached in the opinion.
With respect to the first contention, we think it ought not to be held that Congress intended by the second of the jurisdictional acts to make any provision which might result in the plaintiff’s being paid damages by reason of the defendant having taken over land to which the tribe never had any title unless such intention is clearly expressed by the language used. So far from this being the case, we think that taking the two acts together and all the circumstances surrounding the enactment of the acts, the purpose of the acts is clearly expressed to the contrary. As before stated, the second act is amendatory of the first. It will be observed that the first act only granted this court authority to consider claims growing out of the treaty of Fort Laramie of September 17, 1851, or other treaty rights of the Assini-boine Tribe.[1] The main purpose of the second act was clearly to expand this authority so that the court might—
“ * * * render judgment for any damages resulting from the appropriation by the United States to its own use or to the use of any other Indian tribe by the treaty of October 17, 1855, * * * or the act of Congress of April *364 15, 1874 (18 Stat. 28), of any land, title to the occupancy and use of which was in the said Assiniboine Indian Nation by immemorial possession and the rights or claims to which land the last paragraph of article V of the Treaty of Fort Laramie[2] of September 17, 1851, expressly provided the Assiniboine Nation did not abandon or prejudice: ❖ * $ 5)
Counsel for plaintiff seem to rely on the reference to article Y of the Treaty of Fort Laramie quoted above. It is evident that the act is very crudely (or perhaps artfully) drawn, but we do not think that Congress intended thereby to dispense with any requirement of proof of plaintiff’s title to the lands claimed by “ immemorial possession.” This is shown by the clause following what has just been quoted, namely, “ and if the said courts shall find that any sweh lands of the said Indians were so appropriated they shall award damages ” etc. (Italics ours.) It can hardly be claimed that the act intended this finding should be made from the statements in the act itself. On the contrary, we think it manifest that by the terms of the act it was intended that this finding should be made from the evidence in the case and that the burden of proof, as in all other such cases, is upon the plaintiff tribe to establish the facts necessary to its recovery.
Under the jurisdictional acts hereinabove set out the plaintiff has filed its petition alleging among other things that by various acts of the Government the defendant has appropriated certain lands to which it had title. For convenience in considering the questions thereby raised and for the purpose of orderly discussion thereof, the territory claimed may be divided into two tracts:
First. That granted by the Treaty of Fort Laramie. The material parts of this treaty are set out in finding II. This grant is not denied and in a general way it may be said to include a tract bounded on the north and northwest by *365 the Missouri River as far east as its junction with the Yellowstone, and on the east and southeast by the Yellowstone River, on the southwest by a line drawn from a point where the Powder River enters the Yellowstone in a northwesterly direction to a point where the Musselshell River enters the Missouri. It is somewhat in the shape of a triangle and contains about 6,477,940 acres. It is about half the size of the tract which plaintiff claims to have owned north of the Missouri to which reference will next be made.
Second. A tract north of the Missouri River which in a general way may be said to have extended between Canada on the north and the Missioui River on the south, also from the Rocky Mountains on the west, eastward a comparatively short distance into Dakota.
Plaintiff claims title by “ immemorial possession ” to all of the land contained in both of these tracts and also claims the benefit of the provisions of the Fort Laramie Treaty.
The plaintiff further alleges that by the treaty of October 17, 1855, made with the Piegan, Blackfeet, Blood, Gros-Ventre, and other tribes, a large tract of land was taken from it to which it had title by “ immemorial possession ” and under the Treaty of Fort Laramie and the same granted to the Blackfoot Nation as a reservation for its exclusive use and occupancy. Also, that by the same treaty of October 17, 1855, certain lands were set apart as a common hunting ground for the Blackfoot Nation and the plaintiff to which plaintiff had title by “ immemorial possession ” and to the exclusive use thereof; and that after the ratification of the said treaty, the Gros-Ventre tribe used this land from 1855 to 1874, killing large quantities of game thereon, by which the plaintiff was injured and damaged in the sum of $1,000,000. Besides this, the plaintiff makes a further claim for damages on account of white men killing the buffalo on the land ceded by the Fort Laramie Treaty, to which claim reference will be made further on.
Other appropriations by defendant of the lands to which plaintiff claimed to have title by “ immemorial possession ”, or under the Treaty of Fort Laramie, or by both, are alleged .in the petition, but it is not necessary to set them out in *366 detail here for the reason that there is no question but that the Government did at sometime appropriate all of the lands in controversy.
On the part of the defendant it is contended that the plaintiff never had any title by “immemorial possession” to any of the lands claimed, or any title whatever to lands north of the Missouri River that had been recognized by the defendant, that as to the lands included in the Fort Laramie grant which were taken by the treaty of October 17, 1855, to which reference will be made more particularly hereinafter, the action of the executive and legislative branches, of the Government in ratifying the treaty of 1855 was a determination that the land described in the treaty was in the actual and exclusive occupation of the Indian parties to that treaty and a determination of a political nature binding upon this court. Also, that not long after the execution of the Fort Laramie Treaty the Sioux Indians resumed hostilities against the Assiniboine Tribe and that this tribe abandoned the reservation granted to it by that treaty, retreated to the country north of the Missouri River, and was never afterwards on this land except on small hunting expeditions.
On the issues thus raised the first question to be determined is whether the plaintiff tribe has established by a preponderance of the evidence that it had title by “ immemorial possession ” to any land which has been appropriated by the Government. The testimony bearing on this question is extremely voluminous and in some respects quite conflicting, although part of the conflict may be explained by the fact that the different witnesses were testifying with reference to different times. Within the reasonable limits of an opinion we can only give a general view of the evidence and indicate our ultimate conclusions therefrom. Plaintiff has introduced the greater number of witnesses giving oral testimony but much of the evidence taken on its behalf is from a source that lessens its weight.
A number of Indians were called as witnesses. It was to be expected that they would claim the land over which they had roamed and as to which they might believe they *367 had a better title than other tribes who roamed over the same territory. By explorers and travelers they are shown to have been found in various parts and at various times in Canada and the territory north of the Missouri which they now claim. The most reliable testimony we think is that of the agents of the Government who went among the Indians remaining with them for a considerable period of time, who not only had excellent opportunities to ascertain the facts within the territory where they traveled or operated but had no reason whatever to mate biased or prejudiced statements. This testimony is supplemented by reliable historical accounts of their early origin. In a general way it appears from the conflicting and not very definite testimony that the Assiniboines originated in Canada, probably near the Saskatchewan River; that subsequently they drifted south to the United States and probably into the Dakotas; that they were at one time affiliated with the Sioux Tribe and possibly a part thereof; that they quarreled with the Sioux and separated, the Assiniboines going west, possibly voluntarily, possibly driven by the Sioux, who became their inveterate enemies, and at times pursued them over parts of the region to which they now claim title. Summarizing the evidence, we find that the Assiniboines migrated from Canada into the United States and that they were essentially wanderers and roamers, hunting (in the sense of looking for) game, and at various times were reported to be found in various parts of the tract which they claim.
Before the Treaty of Fort Laramie was made, however, they appear to have ceased making excursions into Canada. The region between the Missouri and the Canadian boundary to which they claim to have obtained title by “ immemorial possession ” is a vast tract containing about 16,000,000 acres. Besides this, as before stated, they also claim the lands of the Fort Laramie Treaty and more, extending south beyond the forty-seventh parallel, making the total width of the tract several hundred miles and its area about 23,000,000 acres. When the lands which they claimed in Canada are included, the extent of their migrations will be seen. Over parts and possibly all of these lands the Assiniboines, a *368 comparatively small tribe, at one time reduced by an epi-i demic to about 1,500, roamed for years along with, other '■ tribes, fighting, hunting, and in small bands pitching their tents here and there to remain for periods not shown by the evidence. So also did other tribes roam over a large portion of this territory, hunting, fighting, and pitching their tents, and to a very considerable proportion of it we think the Blackfeet Indians or the Gros Yentre could show as good or better title so far as occupancy and possession could establish it. So far as the evidence shows, the greater part of this tract north of the Missouri River claimed by plaintiff was a kind of u no man’s land ” prior to the time the Government disposed of it. We think the evidence fails to establish that the plaintiff tribe had held any definite portion of this land by permanent and continued occupancy to the exclusion of all other tribes, and we cannot agree that a tribe which is shown to have made such wide and extensive migrations can be held to have established title by “ immemorial possession ” to the lands over which they roamed.
There are other circumstances that tend to confirm this conclusion from the testimony, although not necessary to sustain it. Ordinarily it would be expected that when an Indian tribe was excluded from or restricted with reference to a region which it claimed to own some protest would be made, but there is no evidence that any members of the plaintiff tribe objected when the Government by the treaty with the Blackfeet in 1855 designated a large portion of this tract north of the Missouri River as a common hunting ground for the plaintiff tribe and the Blackfeet. On the contrary, the plaintiff Indians apparently acquiesced therein and also with subsequent assignments of lands to them on reservations for the purpose of fixing their residence. From time to time the Government made disposition of the lands now claimed by them without any complaint so far as the testimony shows. The record shows' that the Assiniboines were driven off the lands granted them by the treaty of Fort Laramie by hostile Indians and were found in 1868 and 1870 living on the Blackfoot and Gros Ventre Reservation to which and the agency thereon they appear *369 to have attached themselves, doubtless for the reason that they could and did obtain supplies at the agency. In 1886; what was then known as the Gros Ventre, Piegan, Blood; Blackfoot, and River Crow Reservation embraced practically all of the territory north of the Missouri to which' plaintiff now claims title by “immemorial possession.” Upon this reservation an agency had been established at Fort Bel-knap and one at Fort Peck. In 1887, by virtue of the agreements made with the tribes last above named, or some of them, the Assiniboines had been assigned to and lived upon this reservation in some part or parts thereof. In December 1886 and January 1887, an agreement was concluded by the commissioners acting on behalf of the defendant by which the lands included in this reservation were ceded to the United States except such portion thereof as was by the agreement specifically set apart and reserved as separate reservations for the various tribes. Representatives of the Assiniboines signed this agreement under a certificate that it had been fully explained to them and that they consented and agreed to all the stipulations therein contained.
It is true that a number of the Assiniboines testified that the treaty was not signed by them or any of the tribe except possibly by one member and that there were protests made against taking the land away from them at the time. These witnesses were either Indians who were children at the time of the signing of the treaty or very old men at the time when they gave their testimony, and on account of age having at best a very incomplete recollection of matters that occurred fifty years prior thereto. The circumstances of the case make this testimony so unsatisfactory as to be unworthy of any credit. We think the Indian tribes which were a party to the treaty must have understood the general nature of it, namely, that their reservations were to be greatly reduced and assignments made accordingly, which was done at the time. None of the other tribes are shown to have complained of any wrong done, although some of them might have claimed a better right to the land than the Assiniboines. We are not ready to believe that the Government agents who negotiated the treaty committed wholesale forgeries of the *370 signatures of tbe Assiniboines, and there is nothing in the evidence to discredit the signatures to the treaty for other tribes. Nor is there anything in any of the numerous reports of the Indian agents or transactions and dealings with the Assiniboines with reference to the lands north of the Missouri River that show that any complaints were made by them with reference to the execution of the agreement, and we are satisfied that the Assiniboines executed the agreement and knew its nature in general. The agreement last referred to, which ceded back to the Government the greater portion of the land north of the Missouri River, which is now claimed by the plaintiff, was ratified by the act of May 1,1888. Large sums of money were paid by the Government to the Indians in accordance with its terms, of which the Assiniboines received their share and certain portions of the reservation were specially allotted to them. Prior to the time this agreement was made and for years afterwards the Government dealt with them on reservations, paying them sums of money, issuing food and rations to the members of the tribe, partly in accordance with treaties and agreements and partly as mere gratuities. During all this period we have no satisfactory evidence of the plaintiff tribe making any claim to the lands north of the Missouri which they now assert they have always owned and occupied until their claims came before Congress, and even then the bill that was first introduced in their behalf made no reference to lands, the title of which they claim to have acquired by immemorial possession.
We do not think it is necessary to review the evidence further. From all of the testimony we conclude that the plaintiff tribe has failed to establish by the preponderance of the evidence that the Assiniboines had title by “ immemorial possession ” to any of the land north of the Missouri River which the tribe claims. This conclusion makes it unnecessary to determine the other defenses that are made to this claim by the defendant.
The plaintiff’s case with reference to what is called the Fort Laramie lands is quite different. The lands were expressly granted to the plaintiff tribe by the treaty made *371 with the plaintiff on September 17, 1851, and one of its purposes was to give each tribe some fixed boundaries within which they should stipulate generally to reside. It was also desired to give the Indians some compensation for the interference with the Indian hunting expeditions caused by emigrants passing to the Pacific coast region.
There is no question but what the lands granted the plaintiff tribe by the Treaty of Fort Laramie were taken over by the Government, but the time when they were taken has some bearing on the amount of damage which the plaintiff may have sustained thereby.
When the Fort Buford Military Reservation was established by the Executive order of August 18,1868, a part of the Fort Laramie lands in the northeast corner thereof was taken thereby. Of the area set apart to this military reservation, about 163,125 acres lay south of the Missouri River and within the lands ceded to the Assiniboine Nation by the Fort Laramie Treaty. On April 13, 1875, an Executive order was entered by which the greater portion of the tract ceded to plaintiff by the Fort Laramie Treaty was, in the terms of the order, “ withdrawn from sale, and set apart as an addition to the present reservation of the Gros Ventre, Piegan, Blood, Blackfeet, and Crow Indians ”, and of the land included in this order about 5,865,990 acres lay within the boundaries of the land heretofore ceded by the Fort Laramie Treaty to the Assiniboines. The land that was taken for the Fort Buford Reservation and by the Executive order of April 13, 1875, included (with more) all of the land granted to the plaintiff by the Fort Laramie Treaty except a comparatively small portion south of the forty-seventh parallel. In July 1880, by an Executive order a part of the area affected by the Executive order of April 13, 1875, was restored to the public domain, and later and about 1882, the defendant surveyed and filed plats of the portion of the Fort Laramie land south of the forty-seventh parallel and thereafter either opened the land to settlement or donated it to the Northern Pacific Railroad. In this way the Government disposed of all of the land granted to plaintiff by the Fort Laramie Treaty.
*372 As before stated, the defendant contends that before the Government appropriated any of this land the plaintiff tribe had abandoned it. The evidence shows that the Assini-boines had been driven off of this tract by their enemies, the Sioux, who were more warlike, but this fact alone would not warrant a finding that they had abandoned the land ceded to them. There is no evidence that any of the plaintiff tribe were living on this land or in any way occupying it at the time when the Government took it over, although they may still have made hunting expeditions over it. As before stated they were then residing on a Government reservation entirely outside of this tract. Long continued absence from land may be evidence of abandonment depending upon the circumstances. It is not necessary, howeyer, that we should determine whether the plaintiff tribe had abandoned these Fort Laramie lands. For reasons hereinafter set forth, we conclude that even if plaintiff is allowed the value of .these lands at the time they were taken, the defendant is entitled to set off against the allowance a greater sum.
There is much dispute as to the value of the land ceded by the Treaty of Fort Laramie and which, as we have seen, was taken over by the defendant by the proceedings recited above. The plaintiff produced as its chief witnesses persons whom it considers experts of high skill in the matter of land values in this region, but we are not inclined to accept their testimony, although it was doubtless given in good faith. The testimony of these witnesses does not appear to have taken into consideration the proper basis upon which an estimate of the value of these lands must be founded. The tract under consideration consisted of over 6,000,000 acres. Government values and sales of comparatively small, and in some instances select tracts, have but little weight in determining the value of such an enormous body of land when disposed of as a whole. The reasons for this are shown in the opinion in the case of the Fort Berthold Indians v. United States, 71 C.Cls. 308, 339-340, and, as said in the opinion rendered in that case, the land in question had but little value until the railroad was built somewhere near it, and the best measure of value is that paid by “ the Govern *373 ment for lands acquired about the same period of time from other Indian tribes in the same locality in cessions to the Government of their reservations in many treaties.” As an example of the prices so paid, we call attention to the fact that in January 1887 an agreement was made with several tribes, including the Assiniboines, relinquishing their rights to certain lands heretofore granted them aggregating about 17,500,000 acres at a price which would average about 25 cents an acre. It is true that some tracts were ceded for a higher price and it is also true that some were ceded for a much lower price. The geographies and encyclopedias show that the land in controversy was in a semiarid region and that only a very small part was suitable for agriculture unless irrigated; that only a .comparatively small part could be irrigated; and that a certain part of the land was absolutely worthless and the greater part of it was fit only for grazing purposes and required a large number of acres to support a single animal. At the time in question there was a superabundance of western grazing land. We conclude that the value of this land at the time it was taken did not exceed 50 cents an acre and may have been less, and that its total value did not exceed $3,238,970.
One of the separate causes of action in plaintiff’s petition is based on the allegation that as a result of the Presidential order of July 13, 1880 (to which reference is above made), which restored, to the public domain lands belonging to the plaintiff tribe, large numbers of white men entered the land described in said order, who slaughtered the buffalo on such a large scale that it was practically exterminated by the winter of 1883-84 and the members of plaintiff’s tribe, being deprived of their source of food and raiment, died of starvation to the number of about 500, and the plaintiff was thereby damaged in the sum of $1,000,000. This claim is largely based on a provision in the Treaty of Fort Laramie whereby the defendant entered into an agreement to protect the Indian nations who executed the treaty “ against the commission of all depredations by the people of the United States ”, but there are many reasons why this claim for damage cannot be sustained.
*374 It is very doubtful, to say the least, whether the word “ depredations ” can possibly be construed to refer to the killing of wild game, for there was nothing in the treaty that specifically obligated the defendant to preserve the wild game within the territory of the plaintiff tribe. Moreover, if the Government is liable by reason of having taken the 'land under the Executive order it cannot be held liable for its citizens hunting upon it after the order was made. It would seem also that the injury complained of was injury to the individual and not to the tribe, that the amount and money value of the damage was wholly conjectural, and supported by no proof. The Indians of a number of tribes were themselves slaughtering the buffalo and the evidence fails to show that the Indians themselves killed only such as were necessary for food or for their own raiment. There was a market for buffalo hides which the Indians were able to tan and which they sold. We conclude that this part of plaintiff’s claim is without support in either the law or the facts.
For similar reasons and others, the claim for damages done by depredations of the Gros Ventre Tribe in hunting upon lands set apart to the plaintiff and Blackfoot Tribe is also denied.
The amount which the defendant is entitled to offset against any claims which are allowed in favor of the plaintiff is also in dispute. Counsel for defendant contend that the Government is entitled to set off all sums of money expended for the benefit of the Indians, including gratuities, and that this includes the money which the plaintiff tribe has received for surplus lands sold in the two reservations which it has occupied, and also the money paid plaintiff under the treaty of 1888. But the plaintiff insists that the defendant is not entitled to any set-off on account of the land allotted to plaintiff in the two reservations or the money which plaintiff has received for the surplus lands sold, and that the money paid plaintiff under the treaty of 1888 cannot be set off against anything allowed on the plaintiff’s claim for lands between the Yellowstone and Missouri Rivers— that is, the Fort Laramie lands. The question so raised in *375 volves the construction of the language of the two acts. We have set out in the findings the language of the jurisdictional acts, the first of which defined the credits which might be allowed the defendant. As applied to the facts in the case, we find nothing in the first act that in any way limits the credits to be allowed the defendant for any sum or sums paid or expended for the benefit of the plaintiff tribe. The act recites that “ the United States shall be allowed credit subsequent to the date of any Executive order, law, treaty, or agreement under which the claims arise for any sum or sums heretofore paid or expended for the benefit of said Indians.” The original act authorized the court to adjudicate claims arising out of the Treaty of Fort Laramie and the treaty of 1855 and “ any subsequent act of Congress, treaty, agreement, or Executive order ” and provided that the Government should have credit for any sums paid for the benefit of the Indians subsequent to the date thereof. We think that the only controversy which can arise under this provision is as to whether this provision in the first act would apply to lands which were allotted to plaintiff and we do not find it necessary to decide this question for reasons hereinafter stated.
Plaintiff contends that under the provisions of the second jurisdictional act defendant cannot be allowed any set-off on account of moneys paid under the act of 1888 unless it is awarded damages under the provisions of the second jurisdictional act, that is, on account of the appropriation of lands to which plaintiff claims title by “ immemorial possession.” We have already held that plaintiff did not acquire title to any land in that manner, and under this holding a question arises as to whether the defendant can be allowed a set-off on account of money so paid against any claim which the plaintiff may have on account of the appropriation by the defendant of the lands ceded by the Port Laramie treaty.
In order to properly consider the question thus raised it will be necessary to set out and restate to some extent the manner in which the reservation for the Blackfeet, Gros Wentre, and Crow Indians was established. As before *376 stated, the treaties of 1868 were not with the plaintiff tribe but with the Blackfoot Nation and the Gros Ventre Tribe of Indians. Each of these treaties provided that the Government might have the right to place upon the reservation which was created thereby other Indian tribes. The Assini-boines eventually came upon this reservation and established themselves there without any formal order. Subsequently the reservation was enlarged by an Executive order and act of Congress. In the meantime the Assiniboines continued to dwell upon this reservation. In 1886 and 1887 an agreement was concluded with all of the Indians residing upon the Gros Ventre, Piegan, Blackfoot, and River Crow Reservation in Montana (to which the Assiniboines were a party) by which all the Indian tribes which were a party thereto ceded to the United States all their right, title, and interest in the lands embraced in this reservation excepting such as was specially set apart and reserved as separate reservations for any Indian tribes. This treaty provided for certain payments to be made to the Indians who were upon the reservation, and in 18881 Congress passed an act for the fulfillment of the treaty and under which these payments were made. The second jurisdictional act contained a provision as follows:
“ Provided, however, That if the courts shall award damages for land appropriated by the said treaty of 1855, and/or the said act of Congress of 1874, the United States shall be allowed credit for any sum or sums paid the Assiniboine Indian Nation under the act of Congress of May 1, 1888.”
We do not think it can be said that this provision operated to repeal the broad provisions of the first jurisdictional act to the effect that the Government should be allowed credit for any sum or sums heretofore paid or expended for the benefit of said Indians, including gratuities, or that it was inconsistent therewith. Nor do we understand that counsel for plaintiff claim that it placed any limitation on the application of payments made under the act of 1888, but only that it operated to prevent such payments from acting as an estoppel as against plaintiff’s claim that it had title to the land on this reservation by “ immemorial possession.” *377 As we understand plaintiff’s contention, it is that by reason of the fact that (as it claims) the plaintiff held title to these lands through “ immemorial possession ” and had also had portions thereof assigned or allotted to it, the defendant received a full consideration for all payments made under the treaty of 1888 by reason of the plaintiff having joined in ceding the land covered thereby and is not entitled to any further credit therefor. Such a construction would entirely nullify the provision of the first act with reference to credits^ Moreover, we think the obvious intention of the first act and the second act taken together was to effect a settlement between the Government and the plaintiff in which each party would receive all credits to which it was respectively entitled.. "We therefore conclude that the defendant is entitled to offset-all payments made for the benefit of the plaintiff tribe under the act of 1888 against any sum which might be charged against the Government on account of the appropriation of" the lands ceded to plaintiff by the Fort Laramie Treaty..
The Comptroller General’s office has made a careful computation of the sum for which it considers the plaintiff" tribe should be charged, which counsel for defendant contend is $5,137,668.71. See finding XII. Under the foregoing-rulings we think this computation is correct, except as to the items of miscellaneous revenue, Treasury balances,, interest, and “ Crows’ fund ” aggregating $221,563.01. It also includes a number of items where the money was expended only indirectly for the benefit of the Indians, or jointly for their benefit and purposes of the Government. These items-amount to $688,631.14, all of which is more fully set out in finding XII. Assuming for the purposes of the case that none of these items should be credited against the plaintiff" tribe, we have a total of $910,194.15 which should be deducted from the amount estimated by the Comptroller General’s, office, leaving a net credit to the Government of $4,227,474.56, while we have found that the value of the land belonging-to the plaintiff tribe which was appropriated by the Government did not exceed $3,238,970.
There still remains the question of whether the Government should be allowed any credit on account of the land *378 allotted to the plaintiff tribe on the Fort Peck and the Fort Belknap Reservations. We do not find it necessary to determine this question as the amount of payments which we have ■already found the Government is entitled to offset exceeds the value of the land of the plaintiff tribe acquired under the Fort Laramie Treaty and plaintiff’s petition should therefore be dismissed. It is so ordered.
Whaley, Judge; Williams, Judge; and Littletos, Judge, concur.
Booth, Ohief Justice, did not hear this case, on account of illness, and took no part in its decision.
ON MOTION EOR NEW TRIAL
Green, Judge,
delivered the opinion of the court:
Plaintiff complains that the court erred in finding X in stating that the land claimed by the plaintiff, as described in the petition, included “ practically all the territory * * * from the Rocky Mountains on the west to the White Earth River on the east.” It is said that the territory claimed did not extend to the Rocky Mountains on the west, but the finding did not recite that it did. The words “ practically all ” are not exact and were not intended to be. What the court intended was to give a general idea of the location and extent of the territory claimed, as it could not be easily found and identified on an ordinary map from the description set out by plaintiff in its petition. A casual reading of finding X will show that the statement objected to did not relate to facts shown by the evidence but was merely introductory and in explanation of what the plaintiff claimed. The contention is over a matter which could have no effect upon the decision of the court. The objection seems to be hypercritical. We have again reviewed the findings upon which the judgment depends and conclude that they are fully supported by the testimony.
There is complaint also of other statements in finding X, the materiality and bearing of which are so slight that we think they may be stricken as superfluous, or slightly *379 «•changed and avoid the contention thereon. An order will be entered accordingly.
A typographical error crept into the first paragraph of finding VIII. The words therein, “ south of a line drawn «cast ”, should be “ south of a line drawn west.” The error will be corrected by an order.
An order will also be entered striking out the first two •.sentences of finding IX and making an insertion in lieu ■«thereof. The only difference of importance made by the •change is to take out of the finding the statement that the treaties of 1868 “ while never formally ratified, became valid •and binding by reason of the conduct of the parties thereto.” This statement has no bearing on the issues in the case at bar and therefore has no proper place in the findings. It was not referred to in the former opinion and the judgment •was not in any way based upon it.
Finding XII includes certain items therein specified to which, for want of a better term, we have referred in the ifindings and the opinion as amounts which were “ indirectly ” expended for the benefit of the Indians. The defend•ant objects to this language and calls attention to the fact «that similar items were allowed as offsets in the Fort Bertfiold .Indians cease, 71 C.Cls. 308. But it will be observed that in the original opinion in .the case at bar we held in effect that it was unnecesary to pass on the question of whether these items could be used as an offset on the part of the defendant for the reason that the offsets otherwise allowed exceeded the amount allowed by the court to the plaintiff.
In the same finding the court referred to “ miscellaneous .revenue, Treasury balances, interest, and Crows’ fund ”, -aggregating $221,563.01, and it is said that the court overlooked an item of Treasury balance of over $24,000 which ^should have been included in the total. It is also said that the total of what was referred to as having been indirectly •expended for the benefit of the Indians is not quite correct.
It may be that the contentions of the defendant in regard to these matters are well founded, .but we see no necessity of passing upon the questions so raised. The so-called indirect expenditures were not deducted as an offset for the rea *380 son above stated, and-the small error in the other computation referred to, if there was an error, had no- effect on the-judgment. We conclude that it is not necessary to again go» over the elaborate and complicated accounts in the case.
The findings will be corrected as indicated' above, and the-motion for new trial will be overruled.
Whaley, Judge; Williams, Judge; and LittletoN,. Judge, concur.
Booth, Glvief Justice, did not hear this case originally on>. account of illness, and took no part in this decision.

 The act specified “ claims arising under or growing out of the Treaty of Fort Laramie * * * the treaty of October 17, 1855, * * * between the Government of the united States and the Blackfeet Indian Nation and other Indian nations * * * or any subsequent act of Congress, treaty, agreement, or Executive order, or treaty * * * that violates any of the treaty rights of the Assiniboine Indian Nation.” (Italics ours.)

 The Treaty of Fort Laramie contained provisions that the Indian nations executing it recognized certain, tracts of country as their respective territories and the territory of the Assiniboine Nation was particularly specified, but in a further provision of the treaty it was stated that “ the aforesaid Indian nations do not hereby abandon or prejudice any rights or claims they may have to other lands,” and that they did not surrender any privileges of hunting over any of the tracts.