Littleton, Judge,
delivered the opinion of the court:
The Jurisdictional Act, under which this suit was instituted, was approved March 3, 1927, 44 Stat. 1349. It conferred jurisdiction upon this court, with right of appeal to the Supreme Court by either party, to hear, examine, adjudicate, and render judgment in any and all legal and equitable claims which the Shoshone Tribe of Indians of the Wind River Reservation in the State of Wyoming might have against the United States arising under or growing out of the treaty of July 3, 1868, or arising under or growing out of any subsequent treaty or agreement between said Shoshone Tribe and the United States or any subsequent act of Congress affecting the tribe which claims have not heretofore been determined and adjudicated upon their merits by this court or the Supreme Court. In section 3 it was provided that “In said suit the court shall also hear, examine, and adjudicate any claims which the United States may have against said tribe, but any payment, including gratuities which the United States may have made to said tribe, shall not operate as an estoppel but may be pleaded as an offset in such suit: Provided, however, That the United States may interpose to such suit or action any and all pleas of defense, affirmative and negative, legal and equitable, which it may have thereto not herein specifically barred by the provisions of this act. In reference to all claims which may be the subject matter of the suits herein authorized, the decree of the court shall be in full settlement of all damages, if any, committed by the Government of the United States and shall annul and cancel all claim, right, and title of the said Shoshone Indians in and to such money, lands, or other property.”'
1. Several questions are presented which will be discussed in the order of their importance. The first question is whether the United States violated the treaty of July 3, 1868, with plaintiff tribe by placing the Northern Band of *65 Arapahoe Indians upon the Shoshone Reservation, and the determination of this question depends upon whether the plaintiff tribe was willing, with the consent of the United States, to admit the Arapahoe Indians amongst them, as provided in art. 2 of the treaty with the Shoshone Tribe.
The evidence as a whole shows very clearly that the plaintiff tribe did not at any time express its willingness or give its consent to admit the Arapahoe Indians amongst them on the Shoshone or Wind River Reservation within the meaning of this provision of the treaty, and that the plaintiff tribe and the United States did not consent to this arrangement in the manner contemplated by the treaty. This provision of the treaty defining the reservation and providing that the territory “shall be and the same is set apart for the absolute and undisturbed use and occupation of the Shoshone Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them” is the well-known provision inserted in practically all of the treaties made with many Indian tribes about the date on which the treaty with plaintiff tribe was made; and it was well understood, we think, by the Indians concerned and the United States that no other tribe or band of Indians was to be given any rights to or upon the described reservation or permanently settled thereon to live amongst the tribe with which the treaty was made, unless such tribe for whom the reservation was set apart should be willing, with the consent of the United States, to admit other friendly tribes or individual Indians to live amongst them upon the reservation and to use, occupy, and enjoy the reservation and all its facilities or to use, occupy, and enjoy some portion of the reservation equally with the Indians belonging to the tribe with whom the treaty was made. The plaintiff tribe so understood the provisions in question from the date the treaty was made, and the course of dealings between the various Indian tribes and the United States in similar matters has been consistent with this understanding. The usual procedure followed by the United States and Indian tribes in complying with like provisions affecting tribes in *66 treaty relations with, the United States was to obtain the expression of a majority of the male adult Indians concerned. A number of instances could be cited where this procedure has been consistently followed in dealings between the Government and other Indian tribes, but we deem it necessary to cite only a few instances in which the Congress, in statutory enactments, has given recognition to the desirability of the consent of the Indian tribe affected being obtained.
In sections 5 and 6 of the act of May 17, 1882, 22 Stat. 68, 88, and likewise in the acts of July 4, 1884, 23 Stat. 76, and of March 3, 1885, 23 Stat. 362, it was provided that “where Indians are located on reservations created by Executive order he [the President] may, with the consent of the tribes to be affected thereby, expressed in the usual manner, consolidate one or more tribes, and abolish such agencies as are thereby rendered unnecessary.” It was further provided in these acts that “the several appropriations made for millers, blacksmiths, engineers, carpenters, physicians, and for other purposes, and for various articles provided by treaty stipulations for the several tribes of Indians, may be diverted to other uses for the benefits of said tribes, respectively, within the discretion of the President and with the consent of the said tribes expressed in the usual manner.”
In the act of August 19, 1890, 26 Stat. 336, making appropriations for the Northern Cheyennes and Arapahoes for the fiscal year 1891, an amount was appropriated to enable the President to appoint a commission with authority to negotiate with the Northern Band of Cheyenne Indians on the Tongue Eiver Eeservation and in the vicinity of Montana, and with the Northern Band of Cheyennes on the Pine Eidge Eeservation in South Dakota for the removal of said Northern Bands of Cheyenne Indians to a permanent settlement upon any of the existing reservations, and “to negotiate with any other tribes or bands of Indians for such portion of their reservation as may be necessary for the permanent settlement of the said Northern Bands of Cheyennes, as herein contemplated; * * * but no agreement shall take effect until ratified by Congress.”
*67 In February 1870 the Department of Indian Affairs endeavored to obtain the consent of the plaintiff tribe to admit the Northern Band of Arapahoe Indians amongst them, but such consent was refused, and these Indians, which had come to the Shoshone Reservation to treat with the Shoshones for a home, were later removed by the Government to old Fort Casper. Again, in June 1879, after the Northern Band of Arapahoes had been brought back to the Shoshone Reservation and settled thereon without the consent of the Shoshones, as hereinafter discussed, the office of Indian Affairs of the Interior Department wrote James I. Patten, Indian agent for the Shoshones, that it was desired to have Ten Day and his band of Lemki Indians located “on your reservation, provided your Indians will give their assent to the same. You will therefore without delay call a council of the Indians and submit the matter to them, with such explanations and facts as you may deem best, in order to obtain their consent, and report the result.” Such a council was called. The Shoshones refused to give their consent, whereupon Patten reported to the Commissioner of Indian Affairs that “their consent to the proposal of the Department to transfer those Indians to this reservation could not be obtained, and the council adjourned.”
2. The next question is whether the plaintiff tribe expressed its willingness or gave its consent to admit the Northern Band of Arapahoe Indians amongst them in such manner as would conform to art. 2 of the Treaty of 1868 and preclude them from having a just claim for compensation because of the placing of the Arapahoe Indians upon their reservation with equal rights with the Shoshone Indians. We think they did not so consent. The material facts with reference to this feature of the case have been gathered from the entire record, mostly documentary, and have been set forth in the findings and need not be repeated here. Counsel for the defendant base their contention that the Shoshone Indians consented to admit the Arapahoe Indians amongst them upon isolated statements taken from certain letters and reports of Indian agents for the Shoshone Reservation, some of whom went there many years after the Arapahoes were *68 brought upon the reservation and were not familiar with the past history of the matter, and upon the absence of any statement in the annual reports of the Commissioner of Indian Affairs subsequent to 1818 of any friction between the two tribes or of any protest on the part of the Shoshones to the presence on the reservation of the Northern Arapahoes. These contentions of counsel for the defendant fail to find support for the purposes for which made when considered in the light of the whole record. For the most part such statements indicate merely that there had been no hostilities between the tribes and that both tribes were living upon the reservation in a peaceful manner. Although the two tribes had been traditional enemies, the Northern Arapahoes having been allied with the Sioux and Cheyennes, the Shoshones had agreed to make peace with the Arapahoes and they were noted for keeping and fulfilling their agreements. The two tribes have never been very friendly. The record is replete with protests by the Shoshones to the presence of the Arapahoes upon their reservation from the time they were brought there in 1878 until the present time. The only consent the Shoshones ever gave to the presence of the Arapahoes upon the reservation was at the time the Arapahoes were first brought to the reservation under military escort; they were then told that they might remain there for a short time to rest and feed their horses but that they should remove from the reservation as soon as possible.
The fact that the annual reports of the Commissioner of Indian Affairs for 1878 and subsequent years make no reference to the protests and objections of the Shoshones to the Arapahoes sharing their reservation is not, we think, important in view of the fact that the files of the Indian Office in Washington contained written reports definitely stating the position of the Shoshones with reference to the matter. The office of the Commissioner of Indian Affairs had consistently ignored the many reports of Indian Agent Patten stating the position of the Shoshones and asking for instructions. It is worthy of note, however, that in his report as late as 1899 the Commissioner of Indian Affairs, *69 at page 379, stated that “This fall the Shoshones will receive the last installment of their treaty supplies and will be without further support, while the Arapahoes, presumably will still be supplied under the provisions of the Black Hills Agreement. This discrimination will create dissatisfaction and arouse the jealousy of the Shoshones, who have never been very friendly with the Arapahoes, whose joint occupancy of this reservation they regard as an intrusion.” (Itals. supplied.) This statement of the Commissioner of Indian Affairs succinctly states the position which the plaintiff tribe took from the time the Arapahoes were first brought to the Shoshone Reservation in 1878.
The record discloses that the Northern Arapahoe Indians were brought from old Ft. Casper under military escort to the Shoshone Reservation in Wyoming in the winter of 1877-78, as a result of the belief of the Commissioner of Indian Affairs that the Shoshone Indians had given their consent to admit the Arapahoes amongst them on their reservation when such was not the case. This error grew out of the misunderstanding by the Indian Office of the telegram of James Irwin, who had been sent to counsel with the Shoshone Indians with a view to obtaining their consent to admit the Arapahoes amongst them. Irwin did not obtain such consent from the Shoshones, but obtained an agreement with them to make peace with the Arapahoes. Accordingly, on October 17, 1877, Irwin dispatched a telegram to the Commissioner of Indian Affairs in which he stated that he had “held counsel and made peace between Shoshones and Arapahoes.” This the Commissioner of Indian Affairs evidently construed at the time as meaning that the Shoshones had consented to the permanent settlement of the Arapahoes upon the Shoshone Reservation, for, in his annual report dated November 1, 1877, the Commissioner of Indian Affairs stated at page 416 that “In accordance with their earnest request made to the President during the recent visit of the delegation in this city, permission was given the Northern Arapahoes to join the Shoshones on the Wind River Reserve in Wyoming. In a *70 formal council held last month by Agent Irwin with the Shoshones, their consent to the arrangement desired by the Arapahoes was obtained, and the removal of the latter is now in progress.” This erroneous position of the Commissioner of Indian Affairs was afterwards made the basis of a definite ruling in August 1891 by that official that the Arapahoes had equal rights to the reservation which did not depend upon the further consent of the Shoshones. It appears that there was a conflict between Agent Irwin and the Commissioner of Indian Affairs as to their understanding of what the delegation of Northern Arapahoes requested of the President and what the President promised them upon their visit to Washington late in September or early in October 1877. Agent Irwin, who accompanied the delegation to Washington with his own interpreter, appears to have been in a better position to understand what was requested and promised than was the Commissioner of Indian Affairs. Agent Irwin proceeded to carry out the arrangement as he understood it. That matter is only of importance now as throwing light upon the reason for the permanent settlement of the Northern Arapahoe Indians upon the Shoshone Reservation without the consent of the Shoshone Tribe.
3. The next question concerns the date on which the Government took an interest in the Shoshone Reservation for the Northern Band of Arapahoe Indians. Counsel for the defendant contend that this occurred on March 18, 1878, when the first group, consisting of certain chiefs and headmen of the Northern Band of Arapahoes, arrived at the agency upon the reservation and had a conference on the following day with Chief Washakie and other Shoshone Indians, as set forth in the findings. On the other hand, the plaintiff contends that the Arapahoe Indians were brought to and placed upon the reservation as a result of the errors and misunderstandings hereinbefore mentioned, and that this was done by the officials of the Government, who were without authority to act for the Government in that regard; and that, since no action was taken by the President or the Congress approving or ratifying what the *71 Commissioner of Indian Affairs, with the acquiescence of the Secretary of the Interior, had done, there was no legal taking of any title or interest which the Shoshone Indians had in the reservation under their treaty of 1868 for the benefit of the Arapahoes until the enactment of the Jurisdictional Act of March 8, 1927, under which act this suit was brought; that from 1878 to March 3,1927, the Arapahoe Indians were simply intruders upon the reservation whom the Government failed and refused to remove. Plaintiff tribe therefore contends that it is entitled to recover compensation for the value of the use and occupancy of the reservation by the Arapahoes from 1878 to 1927 and to recover the value of a one-half undivided interest in the reservation on the latter date. We are of opinion that the Government, through the Commissioner of Indian Affairs, who by statute was charged with the management of all Indian affairs and all matters arising out of Indian relations under direction of the Secretary of the Interior, and agreeably to such regulations as the Persident might prescribe, took from the plaintiff tribe an undivided one-half interest in all property and property rights to which they were entitled by law for the benefit of the Northern Band of Arapahoe Indians; and that this action of the Government, acting through the Commissioner of Indian Affairs, occurred on August 13, 1891, when that official definitely held that “this office holds that the Arapahoes have equal rights to the land on the said reservation which does not depend upon the further consent of the Shoshones.” (Finding 11.) Prior to that time — that is, from the period March 18, 1878, until August 1891 — the Arapahoes simply resided upon, used, and occupied the reservation equally with the Shoshones as a result of the errors and misunderstandings by the officials charged by law with the management of all Indian affairs as to the willingness and consent of the Shoshones to admit the Arapahoes amongst them, without any definite action having been taken in regard to the matter when the error was first called to the attention of the proper officials.
Prior to August 1891, the whole matter of the presence of the Arapahoes on the Shoshone [Reservation was in a *72 state of uncertainty. The record shows that the Shoshones desired and believed that the Government would finally provide a separate reservation for the Arapahoes, as the Shoshones had been advised would be done, and the Arapahoes were uncertain as to their rights upon the reservation and as to what would ultimately be provided for them. As late as March 30, 1886, the Arapahoes petitioned the Commissioner of Indian Affairs through Thomas M. J ones, then Indian Agent for the Shoshone Reservation, with reference to the uncertainty of their tenure. • On that date Jones advised the Commissioner of Indian Affairs that “I am requested by the leading men of the Arapahoe Indians to state that they feel extremely uneasy in regard to their future prospects in view of a proposed bill before Congress respecting Indian lands. They fear that as Washakie, the chief of the Shoshones (so far as they can learn), has never surrendered on behalf of his tribe any of the land rights to them, but has simply given his consent to the Arapahoes living here, and in case of passage of such an act, the law will fix it that this land belongs solely to the Shoshones, and hence that they will be left out on this reservation and also on the one they came from.” The Department instructed Agent Jones to inform the Arapahoes that they would be taken care of.
The Commissioner of Indian Affairs, under section 2, U. S. Code, title 25, is charged with the management for the Government of all Indian affairs and of all matters arising out of Indian relations and that section provides that “the Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations.” This court has held that the action of the Commissioner of Indian Affairs must be presumed to be the action of the President. Belt's, Executrix, v. The United States, 15 C. Cls. 92. Although the Commissioner of Indian Affairs placed the Arapahoes on the Shoshone Reservation without the consent of the Sho- *73 sbone Tribe and violated art. 2 of the treaty of 1868 in keeping them upon the reservation over the protest of the Shoshones, and in finally holding that they had; rights thereto equal with the Shoshones, he nevertheless was the duly designated and authorized officer to represent the Government in such matters. When the facts as to what had been done were clearly placed before Congress, bills giving this court jurisdiction to determine the rights of the Shoshones in the premises were introduced and recommended for passage from 1912 until the act of March 3, 1927, was finally enacted. This Jurisdictional Act was not, in our opinion, a taking by the Government from the plaintiff tribe of an interest in their reservation for the benefit of the Arapahoes. Its intent and purpose, we think, was only to provide a forum in which the claims of the plaintiff tribe against the United States could be heard and adjudicated. Its only effect, at most, was to ratify what had been done by the Commissioner of Indian Affairs and to place the plaintiff tribe in a position to have its claims adjudicated according to law. The Mille Lac Band of Chippewas v. The United States, 47 C. Cls. 415, 436, affirmed 229 U. S. 498, 500. The Jurisdictional Act makes no admission of liability, or of any ground of liability, on the part of the Government, but merely provides a forum for adjudication of claims according to applicable legal principles. It authorizes this court to hear, examine, adjudicate, and render judgment in any and all legal and equitable claims which the Shoshone Tribe may have against the United States. The act contains no language which can be construed as a taking, at the time of its enactment, of any right, title, or interest of the plaintiff tribe to any lands, monies, or other properties to which they may have been entitled under the Treaty of 1868 or any subsequent agreement or act of Congress, nor does it contain any language indicating a purpose to fix any definite time or date on which any property of the Shoshones, of which they may have been wrongfully deprived, should be valued. We think that if Congress had intended that the Jurisdictional *74 Act be interpreted as tlie taking of lands and other properties of the Shoshones for the benefit of the Arapahoes, it would have used language sufficiently clear to manifest that purpose. In Crozier v. Fried. Krupp Aktiengesellschaft, 224 U. S. 290, it was held that “The adoption by the United States of the wrongful act of an officer is of course an adoption of the act when and as committed, and causes such act of the officer to be, in virtue of the statute, a rightful appropriation by the Government, for which compensation is provided.” In that case the court was construing the act of 1910 authorizing suits against the United States for patent infringement, and the issue involved a patent which had been used without permission of the owner by an officer of the United States prior to the passage of that act. Moreover, the rules with reference to condemnation proceedings and the taking of private property for public use are not entirely applicable to cases such as the one at bar. The Indian tribes were under the control, care, and protection of the United States and, although they could not legally be deprived of any property secured to them by treaty, agreement, or act of Congress, the legal title to lands embraced in reservations set apart for the absolute and undisturbed used and occupancy of Indians remained in the United States. In these circumstances we think the acts of the Commissioner of Indian Affairs, who was the official directly charged with the administration and management of all Indian affairs, may properly be said to have been the acts of the Government. For the reasons stated, it is our opinion that an undivided one-half interest in plaintiff’s reservation was taken from them for the benefit of the Northern Band of Arapahoes on August 13, 1891, and that the plaintiff tribe is entitled to recover the value of an undivided one-half interest in the reservation on that date.
4. The foregoing conclusion makes it necessary for the court to fix the value of an undivided one-half interest in the reservation of 2,343,540 acres. After a careful consideration of the character of the land embraced within this area, *75 its fertility, tbe water supply well situated and suitable for irrigation purposes, and all other factors entering into the question of value in which the Indians were at that time the beneficial owners, such as timber, coal, oil and gas, phosphate, and gypsum, and fees from grazing leases, we have¡ fixed the fair and reasonable value of a one-half undivided interest in the reservation on August 13, 1891, at $1.75 an, acre, or $2,050,597.50. The greater portion of the lands embraced within this reservation was very fertile and unusually well adapted for farming, by reason of the adequate supply of water well situated for use for irrigation purposes. The reservation also embraced a very large area of fine grazing land from which considerable income was being derived from grazing leases. It contained approximately one' billion board feet of excellent timber and portions of the reservation were underlaid with a large quantity of bituminous coal. In 1891, however, no coal of any consequence had been mined, due to lack of demand therefor. The reservation also had railroad facilities. It contained a large, but undetermined, quantity of oil and gas. All of these matters are of great importance in the determination of the value of the land in 1891, since, at that time, the plaintiff tribe was entitled to the net proceeds derived from the reservation from all sources under the act of March 3,1883, 22 Stat. 590, which provided that “The proceeds of all pasturage and sales of timber, coal, or other product of any Indian reservation, except those of the Five Civilized Tribes, and not the result of the labor of any member of such tribe, shall be covered into the Treasury for the benefit of such tribe under such regulations as the Secretary of the Interior shall prescribe.” The oil and gas reserves alone were of great value in 1891. The Government, for the purpose of this suit, fixed the 1926 present value of these reserves at $6,000,000. It is believed that a tracing of the Shoshone or Wind River Reservation showing its boundaries and the rivers which run through it, the areas ceded to the Government, outright and in trust for the Indians, and the present diminished reservation of 808,-500 acres, will be helpful in the consideration of value in the *76 light of the facts hereinbefore set forth in the findings. Snch a tracing follows:

Net income has been steadily derived from various sources on the reservation under the above-quoted statute, and similar statutes subsequent thereto, with the result that for the period of 42 years from 1885 to 1927 net proceeds totaling $1,628,744.56 were derived from the reservation and de *77 posited in the Treasury to the credit of the Arapahoe and plaintiff tribes. In addition to these matters affecting value, the facts show that in April 1896, about five years after the Government definitely took an undivided one-half interest in the reservation for the benefit of the Arapahoes, the United States purchased 55,040 acres on the northern boundary of the reservation, for which it paid $60,000, or slightly more than one dollar an acre. This area contained no minerals or oil and gas. From 1885 to 1927 the proceeds derived by the Indians upon this reservation from cessions and net income from products of the reservation totaled $2,003,590.90, all of which the plaintiff tribe would have owned had not a one-half interest in the reservation and all proceeds therefrom been taken by the Government for the Northern Arapahoes. The above amount does not include the amount received under the cession of 1872.
In 1872, nineteen years prior to the controlling date in 1891, the plaintiff tribe ceded a large tract of land, mostly in the mountainous regions of the reservation, to the Government for about four cents an acre, and counsel for defendant rely upon the price paid for this cession as fixing the value of all other lands on the reservation. It is clear from the facts, however, that this purchase cannot be seriously considered in arriving at the fair and reasonable value of one-half of the reservation in 1891 for the reason, first, that the Indians were uninformed as to the value of the land they were ceding and the representative of the Government who negotiated the purchase made no pretense at offering the Indians an amount equal to the value of their title at that time; and, second, the Indian title at that time consisted merely of the right to use and occupy the lands and they did not have the beneficial right to all net proceeds derived from the sales of timber and other products of "the reservation, as was the case in 1891. Upon the whole record we are of opinion that the value of $2,050,597.50 for a one-half interest in the reservation as it existed in August 1891 is fair and reasonable and fully justified by the facts.
5. The next question relates to the compensation to which the plaintiff is entitled by reason of the use and occupancy *78 of the reservation by the Arapahoes equally with the Shoshones for the period 1878 to 1891. During this period the Arapahoes were maintained on the reservation by the Government without the consent of the plaintiff tribe, during which time no action had been taken by the Government which gave the Arapahoes any rights to or upon the reservation. This was in violation of art. 2 of the Shoshone treaty of 1868. During this period of time the Government profited by having the Arapahoes settled upon the Shoshone Reservation. For many years prior to that time the Government had never been able to keep the Arapahoes upon any defined reservation and they had been causing the Government considerable difficulty. After they were placed upon the Shoshone reservation in 1878 they used the same equally with the Shoshones by hunting, farming, pasturing their stock, building houses and fences, and sharing in the facilities of the agency and the employees provided by the Government for the Shoshone Tribe.
Plaintiff contends that it should be allowed compensation in the amount of $2,088,879.80 for the use and occupancy by the Arapahoes of one-half of the reservation, or 1,171,770 acres, at the rate of 1 éy2 cents an acre a year. We are of opinion that this claimed valuation for use and occupancy by the Arapahoes is excessive and that the better method of determining the value of such use and occupancy, which bears some direct relationship to the benefit to the Government by having the Arapahoes on the reservation, the benefits derived by the Arapahoes, and the damages sustained by the plaintiff tribe, is to arrive at an amount which will approximate the benefits derived by the Government and the Arapahoe Indians and compensate the plaintiff tribe for the uses made of the reservation by the Arapahoes during the period in question. We believe that an amount of twenty-five dollars a year for each Indian in the Arapahoe Tribe is fair and reasonable in the circumstances. During the period from 1878 to 1891 the average annual population of the Arapahoe Tribe was 1,023. On a basis of a value of twenty-five dollars a year for this number of Arapahoes over a period of thirteen years, the plaintiff is entitled to *79 recover $332,475. This amount is therefore allowed plaintiff tribe as the value of the use and occupancy of an undivided one-half interest in its reservation by the Arapahoe Tribe from March 1878 to August 1891.
6. The next claim of plaintiff is for $540,000, alleged damages sustained by plaintiff tribe for trespass by livestock belonging to persons other than the Indians from 1873 to 1894, for which alleged damages plaintiff insists the United States is liable under art. 2 of the treaty which set apart the designated reservation for the absolute and undisturbed use and occupancy of plaintiff tribe; and in which article the United States also agreed that no persons, except those therein designated and authorized so to do, should ever be permitted to pass over, settle upon, or reside in the territory designated in that article for the use of said Indians.
It is insisted by the plaintiff that during this period there were as many as 20,000 horses and cattle annually on the reservation belonging to outside parties, from which the Indians derived no benefit and which stock destroyed much of the grass and hay on the reservation and, in some instances, damaged the crops of plaintiff tribe. The amount of two dollars a head a year for all stock as the damage sustained by the Indians, amounting to $200,000, is claimed by plaintiff from 1873 to 1877, and one-half, or $340,000, from 1878 to 1894.
The evidence shows that at different times during this period a very large number of horses and cattle came upon and grazed over a very large area of the reservation, for the most part north of the Wind Itiver, but we cannot say from the evidence in the record that there were as many as twenty thousand head of horses and cattle grazing upon the reservation annually during the period mentioned, and, even if the United States was liable during that period to compensate the Indians because of this trespass, which we think it was not, as we shall hereinafter endeavor to show, a charge of two dollars a head a year for all stock appears to us to be excessive in view of the fact that the grazing fees on the reservation, under the Department regulations in 1927, were only $2.25 a head a year for cattle and three dollars a head for horses.
*80 A proper interpretation of art. 2 of the treaty we think compels the conclusion that the United States is not liable to respond to the Indians for this alleged damage. During a portion of this period the Indian title consisted only of the right to use and occupy the reservation and they were not, during that period, the legal or beneficial owners of the products of the reservation. The provision of the treaty relied upon was common to practically all of the Indian treaties, and we think it would be an unwarranted construction of the language used in the treaty to place upon the United States the legal obligation to respond in damages if it should fail to keep these vast reservations free from trespassing stock. Stock grazing was one of the principal businesses engaged in by the white settlers in the western country during this period and as such stock grazed over large areas where there were no barriers, it must have been known and contemplated when the treaty of 1868 was written that stock of white settlers, some of whom were then residing within the limits of the reservation and owned stock, and the stock of many others residing near the boundary lines of the reservation, would find their way at times upon the reservation. In these circumstances we think the United States, at most, agreed only to use its best efforts to keep the reservation free from intrusion or trespass by the whites. At the time the treaty with the plaintiff tribe was made, the act of June 30, 1834, 4 Stat. 730, U. S. Code, sec. 179, title 25, was in force and provided that “Every person who drives or otherwise conveys any stock of horses, mules, or cattle, to range and feed on any land belonging to any Indian or Indian tribe, without the consent of such tribe, is liable to a penalty of $1 for each animal of such stock”; and further provided (sec. 180, U. S. C., tit. 25) a penalty of $1 for every person who made a settlement on any lands belonging, secured, or granted by treaty with the United States to any Indian tribe. The said act of 1834, sec. 223, U. S. C., tit. 25, authorized the President to employ the military forces in the enforcement of the provisions of that act. Repeated efforts were made by the Government through Indians agents, with the use of military forces on instruction from the Secretary of the Interior, to keep tres *81 passing stock off the reservation and by the latter official, in attempts to prosecute all persons responsible for trespass with only partial success until about 1894, when trespass by stock upon the reservation was under control.
For the foregoing reasons we are of opinion that the United States is not liable under art. 2 of the treaty for failure to keep plaintiff’s reservation free from trespass of stock, and that plaintiff is not entitled to judgment on this claim.
7. Plaintiff next claims $4,455,000 damages for loss and destruction of game. We shall not undertake to discuss the details of the involved method by which plaintiff arrives at the amount of this claim, which, for the most part, is based upon estimates and percentages, for the reason that we are of opinion that the United States was under no obligation by treaty, or otherwise, to preserve the wild game and fur-bearing animals upon the reservation for the exclusive use and disposition of the Shoshone Indians. The reasons given for the denial of the foregoing claim with reference to trespassing stock and white settlers apply to the claim for damages for loss and destruction of game. It would seem obvious that without express language obligating the United States to compensate the Indians for a loss of this character it was not intended or contemplated by either party to the treaty that the United States would undertake such an impossible task or respond in damages so conjectural and incapable of definite proof. The language of the treaty setting apart the reservation for the use and occupancy of plaintiff tribe was the usual language used in practically all of the Indian treaties, of which there were a great many prior to and at the time of the making of the Shoshone Treaty in 1868, and the knowledge of the conditions existing in the western country at the time the various treaties were made compels the conclusion that the United States did not intend to take upon itself the obligation of preserving the game and fur-bearing animals that might have been upon the various reservations at the time the treaties were made for the sole and exclusive use of the Indians. The treaty in this case did not mention game or fur-bearing animals. They were not a part of the reserva *82 tion. as that term was used in the treaty and the Indians had no title to the game upon which they could base a claim for damages against United States. Section 8 of the act of June 30, 1834, supra (sec. 216, U. S. C., tit. 25), provided that “Every person, other than an Indian, who, within the limits of any tribe with! whom the United States has existing treaties, hunts, or traps, or takes and destroys any peltries or game, except for subsistence in the Indian country, shall forfeit all the traps, guns, and ammunition in his possession, used or procured to be used for that purpose, and all peltries so taken; and shall be liable in addition to a penalty of $500.”
It seems clear to us that the United States assumed no greater obligation in the preservation of game on Indian reservations than to use its best efforts to enforce the law.
In the case of the Blackfeet, Blood, Piegan, and Gros Ventre Nations or Tribes of Indians v. The United States, no. E-427, decided April 8, 1935 (81 C. Cls. 101), this court, in denying a similar claim, said “The proof adduced to sustain the damages claimed is based upon what the plaintiffs assert as the reasonable value of the hunting grounds to the plaintiffs, equal in amount to the value of the food, clothing, lodges for shelter, bedding, furs, and hides necessary for the support and maintenance of each of the tribes for that portion of the 99 years of which they allege they were deprived. From historical and official documents the average number of the various tribes interested is sought to be established and a stated sum of $100 per year per person is fixed as the reasonable value of food, etc., necessary to maintain them. The treaty contains no express stipulation that the Government will respond in damages for the diminution in quantity or the entire loss of food and shelter supplies at the time available on the hunting ground. * * * The limited privilege and license to exploit the territory for game and wild animals, while limited as to parties, was not, we think, intended to fix other obligations than the one to delimit an area of lands, vast in extent, over which the Indians mentioned might hunt without interference from other and hostile tribes. Assuredly no article of the treaty may be cited wherein the Government *83 obligated itself to maintain this enormous acreage of land as a game preserve for the Indians for 99 years. The right accorded was a permissive one and its continued existence was dependent upon numerous factors over which neither the Government nor the Indians could possibly have control. The Indians for many years had hunted over this area and conflicting claims were set up as to the right to do so; the treaty did no more than adjust the difference by an amicable agreement among the Indians that those mentioned in the treaty would assent to the common privilege set forth therein, without in any way or by any terms guaranteeing to the Indians a maintenance of the status quo for almost a century. We need not, however, discuss at length the arguments pro and con advanced in the brief. The plaintiff’s contention is vulnerable in many aspects. The court under the law could not award a money judgment upon proof conjectural and uncertain as to facts. Human testimony is incapable of establishing with any degree of certainty that either the quantity or character of food and shelter supplies at the time on the hunting ground area would have remained sufficient to supply the plaintiff’s needs had not the white emigrants and the Indian traders gone upon the lands. * * * It would be impossible from the record to ascribe to the Government alone the responsibility for the disappearance of game and wild animals from the hunting ground. * *
Plaintiff is not entitled to judgment upon this item of the claim.
8. Plaintiff next claims that it should be compensated in the amount of $101,520 for the value of wood and hay requisitioned for use at the military post from 1869 to 1909, inclusive. Of this amount, $43,020 represents the value claimed for wood at the rate of fifty cents a cord and one dollar a ton for the hay over a period of forty years. The amount of $58,500 represents claimed interest.
The facts show that the military forces at the military post on the reservation did use a considerable quantity of wood and hay, but it is shown by the evidence that the Indians of the Shoshone Tribe who were authorized by the Interior Department to supply this wood and hay to the *84 military post were, during a greater portion of the period, given contracts by the Indian agent on authority of the Secretary of the Interior to deliver such wood and hay to the military post. The Indians were paid by the military authorities for the wood and hay furnished, and even if the Indian tribe had been the beneficial owner of the wood and hay on the reservation, which we think they were not prior to 1883, no recovery can be had in the circumstances.
Plaintiff contends that the Shoshone Tribe, as such, was .the one entitled to compensation, and that it is of no consequence that the individual Indians who furnished the wood and hay received payment therefor. We cannot agree with this contention. Plaintiff is not entitled to judgment upon this claim.
9. The next item relates to plaintiff’s claim for $1,106,150, alleged value of gold removed from land within the boundaries of the reservation between 1868 and 1874, inclusive. Plaintiff’s estimate of the value of the gold removed from land within the original reservation is, we think, somewhat speculative and exorbitant, but it is admitted by all that a large quantity of gold was mined and removed from land embraced within the original boundary lines of the reservation as fixed in the treaty of 1868. Gold produced from the Miners’ Delight district was taken from two types of deposits — lodes and placers. Miners’ Delight lode was mined to an average depth of 100 feet for a distance of 1,900 feet; the width of the vein varied from 1 y2 to 5 feet; carried values from wall to wall averaged $15 to $40 a ton; and all ore was treated in stamp mills. The placers were likewise productive of much valuable gold.
The evidence is undisputed that a large quantity of gold -was removed from lands lying within the boundaries of the reservation.' The Government admits that gold of the net value of approximately $350,000 was mined within the reservation. Upon a consideration of all the evidence contained in the record, we are of opinion that the maximum value of gold removed from mines located within the limits of the reservation did not exceed $500,000. However, we deem it unnecessary to discuss this matter in detail, for the reason that, in our opinion, the plaintiff cannot recover on this *85 item. Prior to and at the time of the making of the treaty of 1868, gold had been discovered and was being mined in the district mentioned, and the boundaries of the reservation as fixed by the treaty included within the reservation a portion of this mining district; in fact, the most valuable mines in the district were afterwards found to be located upon the reservation. As a result of this a commissioner was appointed pursuant to the act of Congress of June 1, 1872, to negotiate with the plaintiff tribe for the relinquishment of that portion of the reservation which included the mines and all gold-bearing land. Accordingly, an agreement was entered into between plaintiff tribe and the United States on September 26, 1872, ratified December 15, 1874 (18 Stat. 291), in which the former ceded to the United States, without any reservations whatever, approximately 700,000 acres of land, which included all the territory embraced within the boundaries of the reservation in any way affected by the gold-mining operations. A consideration of $27,500, specified in this agreement, was appropriated and paid, with the exception of about $14. In these circumstances we are not authorized under the jurisdictional act to reopen this matter. Moreover, the Indian title at the time this cession was made consisted only of the right to use and occupy the reservation, and at that time the Indians were not the legal or beneficial owners of the mineral rights.
10. The next item on which plaintiff seeks to recover amounts to $418,820.53, of which $245,980.98 represents the unexpended balance of the total appropriations of $1,375,-665.34 made for the purpose of carrying out the provisions of the Shoshone Treaty of July 3, 1868, and $172,839.55 represents expenditures under arts. 7, 9, and 10, for transportation of supplies, fuel, and light, miscellaneous agency expenses, agency buildings and repairs, Indian police clothing, pay of interpreters, and one-half of the expenditures made for education and treaty employees from the time the Arapahoes arrived on the reservation in 1878 to June 30, 1927, inclusive.
We are of opinion that the plaintiff is not entitled to recover on this item of the claim. Under the treaty of 1868 the United States did not agree to pay the plaintiff tribe *86 any amount in money in respect of the matters of which plaintiff complains, and the fact that it appropriated more money for the purpose of carrying out the provisions of the treaty of 1868 than was found necessary to be disbursed for the articles, and facilities and employees agreed to be furnished in the treaty does not entitle the plaintiff to recover any portion of the unexpended balance appropriated for these various purposes unless it is shown that there was a failure on the part of the United States to furnish the provisions, facilities, or employees specified in the treaty. Even in the latter event it would be necessary for plaintiff to show wherein the United States had failed to fulfill its obligation under the treaty and the extent of such failure. This has not been done. The plaintiff, in its brief, makes some reference to the fact that the United States did not fully comply with art. 7 of the treaty by making sufficient appropriations to provide a school building and a teacher for every thirty children, between the ages of 6 and 16 years, for twenty years. There is some evidence in the record that a school and a teacher were not provided for every thirty children in the Shoshone Tribe between the ages mentioned for the period specified, but the plaintiff makes no definite claim in this regard and the evidence does not establish that the schools and teachers furnished by the Government were not adequate to take care of the number of children between the ages specified who could be induced to attend school.
The Congress in the various appropriation acts from year to year appropriated specific amounts for specified purposes in the fulfillment of its obligations under the treaty, and the amounts making up the total returned to the Treasury by surplus warrants represented the portion of the amounts specifically appropriated which were found not to be needed for the purposes for which they were appropriated. It has not been shown that the United States did not furnish suitable agency buildings under art. 3; schools and teachers under art. 7; seeds and implements, and a second blacksmith sufficient for the needs of those Indians who engaged in farming under art. 8; annuity goods, clothing, provisions, *87 etc., under art. 9; and sufficient skilled employees for the needs of the Indians under art. 10.
Typical cases illustrating the reason for the return to the Treasury of a portion of the total appropriations for fulfilling the treaty may be cited in connection with the appropriations under art. 9 for annuity goods, clothing, provisions, etc., and for payments to Indians roaming and farming. In respect to the former, the total disbursements for supplying annuity goods, clothing, provisions, etc., were $254,651.54, leaving $30,015.26 specifically appropriated for this purpose which was returned to the Treasury by surplus warrant. In respect of the latter, Congress specifically appropriated a total of $265,000 to provide for payments to Indians roaming and farming, and only $237,501.06 was found necessary to be expended for this purpose, leaving a balance of $29,903.68 of such appropriation which was returned to the Treasury by surplus warrant.
What has been said above with reference to plaintiff’s right to recover the unexpended balance of the appropriations made to carry out the provisions of the treaty applies to the amounts sought to be recovered with respect to disbursements for transportation of supplies, fuel and light, etc., which were disbursed and charged to the account “Fulfilling Treaty with the Shoshones.” Plaintiff claims that disbursements for the purposes mentioned above represented Government expenditures, which were not proper charges against the Indian tribe. No offsets or counterclaims are made, or could be made, in respect of any disbursements in fulfilling the obligation of the United States under its treaty with the plaintiff tribe, and we fail to see wherein the tribe has any legal or equitable claim for the recovery from the Government of any amount expended by it in providing and maintaining the facilities and employees agreed to be furnished under the treaty. Even if the amounts expended for the purposes mentioned in maintaining the agency buildings, Indian police, and for transportation of supplies be treated as Government expenditures and deducted from the total expenditure disbursed in fulfilling the treaty of 1868, we fail to find in the treaty any provision that would entitle *88 the plaintiff to a judgment for the amounts so expended. Interpreters were employed to enable the Government and the plaintiff tribe properly to carry on their negotiations and dealings with each other. The amounts disbursed- for that purpose fall in the same class as the disbursements previously mentioned. Nor do we think that plaintiff tribe is entitled to recover one-half of the total disbursements made for educational purposes and for skilled employees under art. 10 in the total amount of $261,313.36 after the Arapahoe Indians came upon the reservation in 1878 to June 30, 1927, for the reason that the evidence does not establish that the plaintiff tribe failed to receive the services of the employees specified according to their needs. Appropriations for skilled employees were made by Congress from year to year for the Arapahoe Tribe of Indians after they moved to the Shoshone Reservation, and there is some evidence in the record that the number of employees at the agency was increased after the arrival of the Arapahoe Indians.
On the whole, we are of opinion that plaintiff is not entitled to recover any amount in respect of the unexpended balance of the total treaty appropriations returned to the Treasury by surplus warrants nor in respect of the treaty expenditures made for various purposes after the arrival of the Arapahoe Indians.
11. The next item relates to the cession agreement of September 26, 1872, supra, (finding 21), under which the United States agreed to purchase and deliver on or before August 10 of each year cattle in the amount of $5,000 annually for five years, and, further, to pay $500 per annum as salary for a like period to Washakie, chief of the Shoshone Tribe of Indians. The amount of $27,485.50 was paid to or expended for the benefit of plaintiff tribe and the balance of $14.50 of the total consideration appropriated by Congress for fulfilling the provisions of this agreement was returned to the Treasury by surplus warrant. Plaintiff is entitled to recover the latter amount.
12. The next item relates to the Big Horn Hot Springs Cession Agreement of April 21, 1896, 30 Stat. 93, in which 55,040 acres were ceded to the United States for a total *89 consideration of $60,000. The total consideration mentioned was appropriated and disbursed as shown in finding 22. Under our decision that an undivided one-half interest in the Shoshone or Wind River Reservation was taken for the benefit of the Northern Arapahoe Indians on August 13, 1891, the plaintiff tribe and the Arapahoe Tribe of Indians were each entitled to one-half of the consideration agreed to be paid under this agreement. The Arapahoe Tribe of Indians have been paid or credited with $7,661.84 in excess of the amount to which they were entitled under this agreement, and plaintiff is entitled to judgment for this amount.
13. The next item relates to the agreement of April 21, 1904, 33 Stat. 1016 (finding 23), under which the plaintiff tribe and the Arapahoe Tribe were likewise each entitled to one-half the proceeds derived thereunder, and each tribe was chargeable with one-half of the disbursements made out of the funds so derived. On this basis the plaintiff tribe is entitled to recover $3,014.98, for which judgment will be entered.
14. The next item relates to the net income of $1,628,744.56 derived from the Wind River Reservation under the act of March 3, 1883, 22 Stat. 590; the act of March 2, 1887, 24 Stat. 449; and the act of May 18, 1916, 39 Stat. 123, from which certain expenditures were made, as set forth in finding 24, leaving a balance of $111,937.62 on hand. Inasmuch as each tribe owned an equal interest in the reservation, they were each entitled to be credited with one-half of this income, which was chargeable against the respective tribes as and when expended. On this basis plaintiff was entitled on June 30, 1927, the date on which the accounting ended, to $89,704.17. This amount will be included by the court in the sum found to be due the plaintiff herein.
15. The last item of plaintiff’s claim relates to interest. It claims interest at the rate of 7 percent per annum, the legal rate in Wyoming, which interest claim applies to the value of the interest in the Reservation which was taken for the Arapahoes and to the value of the use and occupancy by the Arapahoes from 1878 to 1891, as well as to the amount *90 allowed under the agreement of 1896 representing the amount to which plaintiff was entitled, but which was diverted to the use of the Arapahoes.
The jurisdictional act under which this suit was brought makes no mention of interest, except in sec. 2 thereof where it is provided that all amounts which may be found due and recoverable by said tribe, less attorneys’ fees and expenses, shall be deposited in the Treasury of the United States to the credit of said tribe and shall draw interest at the rate of 4 percent per annum from the date of the judgment or decree. The provisions of sec. 1 of the act simply confer jurisdiction on this court to hear, examine, adjudicate, and render judgment in any and all legal and equitable claims of plaintiff tribe, and the provisions of sec. 3 that “the decree of the court shall be in full settlement of all damages, if any, committed by the Government of the United States and shall annul and cancel all claim, right, and title of the said Shoshone Indians in and to such money, lands, or other property” do not, we think, authorize this court to allow interest upon any item of the claim in view of other provisions of the law that no interest shall be allowable on any claim against the United States unless specifically authorized by statute or by contract. Section 177 of the Judicial Code denying the allowance of interest in suits against the United States is of such long standing that it must be presumed that had Congress intended in the jurisdictional act, under which this suit was brought, that interest be recoverable on any of the items of the claim it would have so provided. In the case of United States v. Omaha Tribe of Indians, 253 U. S. 275, the court upon a claim for interest on an amount recovered under a cession agreement by the Omaha Indians said: “It is contended, however, both as to the award for the excess land and as to another claim allowed, that as the jurisdictional act calls for the consideration of equitable as well as legal claims, the ordinary rule of equity ought to be followed as to the allowance of interest (Himely v. Rose, 5 Cranch. 313, 319, being cited). But the jurisdictional act cannot be regarded as taking the case out of the usual rule. Tillson v. United States, 100 U. S. 43, 46; Harvey v. United States, 113 U. S. 243, 249 * * In Tillson v. United *91 States, supra, tbe court said with respect to a claim for interest under the jurisdictional act, in all material respects the same as the act now before the court, that “We have no doubt it was the wish of those who procured the passage of the special statute under which the Court of Claims took jurisdiction of this suit to obtain from Congress authority for that court to give a judgment against the United States at least for interest, in case it should be found that payments on the contracts held by the claimants had been unreasonably delayed. But if Congress had desired to grant such authority, it would have been easy to have said so in express terms; and because it did not say so, we are led irresistibly to the conclusion that it did not intend to give any such power. By the statute, the court was required to investigate the claim, and 'ascertain, determine, and adjudge the amount equitably due such firm, if any, for such loss or damage.’ There is nowhere any intimation that the investigation is to be conducted otherwise than judicially. The reference was made to the court as a court, and not to the judges as arbitrators. The determination is to be made according to the fixed rules which govern that court in the adjudication of causes, and not at the discretion of the judges. The same principles of jurisprudence and the same statutory regulations as to practice are to be applied here that would be if the case had come into the court under its general jurisdiction. It is to be ascertained and determined what, if anything, is due the claimants from the Government, according to the rules of law applicable to the settlement in that court of controversies between the Government and its citizens. The special statute does not even provide that the adjustment shall be made upon principles applicable to suits between citizens. To our minds the word ‘equitable’, as here used, means no more than that the rules of law applicable to the case shall be construed liberally in favor of the claimants. * * * Interest, however, would have been recoverable as against a citizen, if the payments were unreasonably delayed. But with the Government the rule is different, for in addition to the practice which has long prevailed in the departments of not allowing interest on claims presented, except it is in some way specially provided for, the statute *92 under which the Court of Claims is organized expressly declares ‘that no interest shall be allowed on any claim up to the time of the rendition of judgment thereon in the Court of Claims, unless upon a contract expressly stipulating for interest.’ Rev. Stat., sect. 1091. This is conclusive.” See, also, Ely v. The United States, 19 C. Cls. 658, in which this court held that interest as damages is controlled by the Bevised Statutes, sec. 1091 (sec. 117, Judicial Code), though the action be authorized by a special act; and Citizen Indians of the Weas et al. v. The United States, 26 C. Cls. 323, in which the court held that interest in the nature of damages could not be recovered from the United States. Under these authorities plaintiff’s claim for interest must be denied.
The amounts which we have concluded the plaintiff tribe is entitled to recover in respect of the various items of the claim total $2,483,461.99.
16. The next feature of the case relates to the offsets claimed by the defendant under the special jurisdictional act consisting of gratuity disbursements under other than treaty appropriations and under specific appropriations. The defendant claims offsets in the total amount of $2,947,-747.05. The facts and circumstances relating to these disbursements have been set forth in detail in findings 25 to 34, inclusive, and will not be repeated here. The total of the offsets set up by the Government in its brief, as above mentioned, have been reduced to $1,689,646.50 as a result of the allocation by the court of a portion of the direct charges made against the plaintiff tribe to joint expenditures for the benefit of both tribes for the reason that the record does not disclose any direct charges against the Arapahoe Tribe in those instances. It would obviously be unfair to offset against the plaintiff tribe expenditures made for purposes in the benefits of which both tribes shared equally, even though such expenditures were charged on the books of the Government directly against the plaintiff tribe. This accounts for a portion of the reduction in the claimed offsets. The balance of the reduction consists of the elimination of two items of $235,963.70 disbursed during the period 1913 to 1927 for roads and bridges on the Shoshone Eeservation and $2,264,123 representing disbursements for irrigation *93 systems on the same reservation during the period 1906 to 1927. We think it is clear that these items are not at this time proper offsets against the plaintiff tribe, as such, in view of the facts disclosed in the findings and the provisions of the acts of Congress quoted therein. The act of July 1, 1932, 47 Stat. 564, provided for the elimination of outstanding reimbursable charges for roads and bridges and the balance outstanding on December 15, 1932, in the amount of $131,492.50, was eliminated and no longer constitutes a reimbursable charge against the Indian tribe, as such. The same is true with reference to the expenditures for irrigation, which, by law, has become a charge against the individual Indians to whom land has been allotted and constitutes a first lien on such land. An area of 245,058 acres on the diminished reservation had been allotted in severalty during the period 1907 to 1919.
Plaintiff claims that all expenditures for roads and bridges should be excluded from the offsets, but it seems clear that the act of 1932 authorized elimination only of amounts expended for roads and bridges which the appropriation acts made reimbursable by the tribe. All other expenditures for this purpose, which totaled $266,105.38, remained in the same class as other gratuity disbursements.
Plaintiff contends that the expenditures for pay of agents and interpreters, transportation of supplies, expenses of delegations, and for presents, made out of gratuity appropriations, are not proper offsets chargeable against the tribe, for the reason that the amounts paid out for such purposes were strictly governmental expenditures and that the jurisdictional act did not contemplate that the plaintiff tribe should be charged therewith. With this contention we cannot agree. A similar claim was denied by this court in the case of Blackfeet, Blood, Piegan, and Gros Ventre Tribes of Indians v. U. S., supra, in connection with which the court said:
Expenditures for the payment of agents, Indian police, judges, interpreters, miscellaneous employees, agency buildings and repairs, superintendents and teachers, surveying, and other like items. It is contended by plaintiffs that these *94 disbursements were made for the general administrative expenses of the Indian Service of the United States, and that the record does not show that the plaintiffs, as tribes, received any benefit from such expenditures, or, even if it be assumed they did, to what extent-.
It is difficult to conceive any theory under which these expenditures did not inure directly to the benefit of the plaintiff tribes. They were expenditures which the United States was under no legal obligation to make for, or in behalf of, the plaintiffs. They were unqualified gratuities, and, as such, under the plain provisions of the jurisdictional act, are properly chargeable against the plaintiffs as set-offs against the amounts they are entitled to recover.
The total of the offsets to which the defendant is entitled against the plaintiff tribe is $1,689,646.50. The deduction of this amount from the total of $2,488,461.99, which we hold the plaintiff is entitled to recover, leaves a balance of $193,821.49 for which judgment will be entered in favor of plaintiff. It is so ordered.
Whaley, Judge; Williams, Judge; GREEN, Judge; and Booth, Chief Justice, concur.
on plaintiff’s and defendant’s motions for new trial and AMENDMENT OF FINDINGS OF FACT
Per Curiam:
Motions for a new trial have been filed by both parties. Plaintiff’s motion for a new trial is based upon the ground that the court erred in holding (1) that an interest in the Shoshone Reservation was taken for the benefit of the Arapahoes in 1891 rather than in March 1921 when the Jurisdictional Act was passed; (2) in allowing inadequate compensation for the value of the land taken on the theory that the taking occurred in 1891, and (3) in refusing to allow interest at a reasonable rate as part of compensation for the property taken and not paid for.
The defendant’s motion for a new trial, except for two items of additional offsets for alleged gratuity disbursements made subsequent to June 30, 1927, is based wholly upon a reargument of the original issues and facts presented in the case and fully considered and discussed by the court in its opinion heretofore rendered.
*95 We have carefully studied these motions for a new trial and the briefs in support thereof, and the additional photostatic copy of documents submitted by the defendant as newly discovered evidence. The entire record has been again carefully studied and considered in the light of the contentions and arguments made in the motions for a new trial and nothing has been found that convinces the court that the findings heretofore made or the conclusions set forth in the original opinion should in anywise be changed or modified. And the court is also satisfied that there is no basis for the granting of a new trial under Section 175 of the Judicial Code on the ground that a wrong or injustice has been done to the United States by reason of the rendition of the judgment in favor of plaintiff herein. If, under all of the facts and circumstances as disclosed by the record and the history of this case from 1878, when the Arapahoes were brought to and placed upon the Shoshone Keservation over the objection of plaintiff, any wrong or injustice has been done in the disposition that the court has made of the matter, it was against the plaintiff in the conclusion that the Shoshone property was actually and legally taken in 1891 instead of 1927, in the value given to the Shoshones for the property taken from them, and in not allowing interest as a part of the measure of compensation. But the court labored upon the case and the authorities upon the subject and carefully studied and considered the record for many months, in the light of all of the statutes enacted by Congress, and the dealings between the plaintiff tribe and the Government, and it is satisfied that the conclusions reached and the judgment rendered in the original opinion are sustained by the record and are fair and reasonable under all of the circumstances in view of the relationship existing between the Indians and the Government. If the court had been dealing with similar questions between private parties or between the Government and a citizen, conclusions more favorable to the plaintiff as to the date of taking and the matter of interest probably would have been compelled by the facts and circumstances. On the whole, therefore, the court is of opinion that there is no merit in either motion for a new trial and that they should be overruled.
*96 The defendant has submitted a supplemental report from the General Accounting Office with reference to disbursements charged to the plaintiff tribe, and to the plaintiff and the Arapahoe Tribe jointly, for the period July 1, 1927, to June 30, 1934, the previous accounting report submitted to and considered by the court covering only the period from 1868 to June 30, 1927. This supplemental accounting report shows disbursements1 totalling $6,904.48 charged directly to the plaintiff tribe and $742,404.66 charged jointly against plaintiff and the Arapahoe Tribe. Of the latter amount $255,028.30 represented the amount disbursed for irrigation, which, under the court’s opinion, is not a proper item of offset. This leaves a balance of $487,376.36, which the defendant insists the court should prorate to the two tribes on the basis of population and deduct from the judgment rendered herein in favor of plaintiff and that a new trial should be granted and the judgment heretofore entered should be vacated for this purpose. The court finds no reason for granting a new trial and reopening the case in respect of these disbursements. They can be handled by the Interior Department and the accounting officers of the Government under and in accordance with the very definite rules laid down by the court in the opinion heretofore published, and the accounts of the two tribes with the Government for the period July 1, 1927, to June 30, 1934, and subsequently, can be adjusted accordingly. The Jurisdictional Act under which this case was decided contemplated that the court should decide the principles involved and announce the rules to be followed in the matter of accounting between the Government and the two tribes with reference to the property and moneys of the Shoshone Indians taken for the benefit of the Arapahoe Tribe, and that any matters of accounting to the two tribes for funds subsequently arising should be carried out in accordance with the opinion of the court. If this were not true it would be necessary for the court to keep the case continually open for consideration of future disbursements.
The motions for a new trial and amendment of the findings are overruled, and it is so ordered.