**ALCEA BAND OF TILLAMOOKS et al. v. UNITED STATES.**

No. 45230.

Court of Claims.
April 2, 1945.

thereof, and their descendants, described in the ratified treaties of September 10, 1853 (10 Stat. 1018), September 19, 1853 (10 Stat. 1027), November 18, 1854 (10 Stat. 1122), November 25, 1854 (10 Stat. 1125), January 22, 1855 (10 Stat. 1143), and December 21, 1855 (12 Stat. 981), may have against the United States; and (b) any and all legal and equitable claims arising under or growing out of the original Indian title, claim, or rights in, to, or upon the whole or any part of the lands and their appurtenances occupied by the Indian tribes and bands described in the unratified treaties published in Senate Executive Document Numbered 25, Fifty-third Congress, first session (pp. 8 to 15), at and long prior to the dates thereof, except the Coos Bay, Lower Umpqua, and Siuslaw Tribes, it being the intention of this Act to include all the Indian tribes or bands and their descendants, with the exceptions named, residing in the then Territory of Oregon west of the Cascade Range at and long prior to the dates of the said unratified treaties, some of whom, in 1855, or later, were removed by the military authorities of the United States to the Coast Range, the Grand Ronde, and the Siletz Reservations in said Territory."

Sec. 2 provides "That if any claim or claims be submitted to said Courts hereunder they shall settle the rights therein, both legal and equitable, of each and all the parties thereto, notwithstanding the lapse of time or the statutes of limitation; * * * and any nation, tribe, or band the court may deem necessary to a final determination of such suit or suits may be joined therein by order of the court." This section further provides that "The petition shall set forth all the facts upon which the claims are based and shall be signed and verified by the attorney or attorneys employed to prosecute such claim or claims and who are under contract with said Indians approved in accordance with existing law." It further provides that any and all claims against the United States should be forever barred "unless suit be instituted or petition filed as herein provided" within five years from date of approval of the act.

Plaintiffs brought suit under clause (b) of the act upon claims arising under or growing out of the original Indian title, claim, or rights in, to, or upon lands occupied by Indian tribes and bands described in the unratified treaty dated August 11,

Everett Sanders, of Washington, D. C. (John G. Mullen, of North Bend, Or., E. L. Crawford, of Salem, Or., and L. A. Gravelle, Douglas Whitlock, and Edward F. Howrey, all of Washington, D. C., on the brief), for plaintiff.

Charles H. Small, of Washington, D. C., and Norman M. Littell, Asst. Atty. Gen. (Raymond T. Nagle, of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

Section 1 of the jurisdictional act, Act of Aug. 26, 1935, 49 Stat. 801, under which this suit was brought, provides as follows:

"That jurisdiction is hereby conferred on the Court of Claims with the right of appeal to the Supreme Court of the United States by either party, as in other cases, to hear, examine, adjudicate, and render final judgment (a) in any and all legal and equitable claims, arising under or growing out of any treaty, agreement, Act of Congress, or Executive order, or for the failure of the United States to pay any money or other property due, which those Indian tribes or bands, or portions

1855, published in Senate Executive Document No. 25, Fifty-third Congress, first session, p. 815. This unratified treaty is set out in full in paragraph 8 of the petition (see finding 3).

The first question to be disposed of is whether certain tribes and bands made parties plaintiff in the petition herein are entitled under the jurisdictional act and the allegations of the petition to bring and maintain this suit for compensation.

The second amended petition sets forth, in paragraphs 5, 6 and 7, specific claims based on original Indian title for lands alleged to have been taken only by and on behalf of plaintiff tribes and bands of Tillamooks, Coquilles, Too-too-to-neys, and Chetcos. The petition does not set forth facts sufficient to show the nature or extent of any legal or equitable claim, or claims, if any, which any of the tribes made plaintiffs in the petition, other than the four tribes above mentioned, may have against the United States.

Paragraph 13 of the amended petition seems to be a blanket claim without any allegation of facts to show the nature, extent, or basis thereof, on behalf of all tribes and bands of Indians made plaintiffs herein, including the Tillamooks, Coquilles, Too-too-to-neys, and Chetcos, whether they did or did not have treaties ratified or unratified with the Government, or no treaties at all, some of which Indians appear to have been, at some time not alleged, placed by the Government on the Coast Reservation conditionally created by Executive Order of November 9, 1855, as set forth in finding 13.

Paragraph 11 of the petition states "That said plaintiffs were Coast tribes" and that when said reservation was set apart for "Coast, Umpqua and Willamette tribes they became entitled jointly with such other Indians therein named to its lands for a reservation to the exclusion of Indians not therein named. That defendant violated their said rights in said reservation to their great damage by placing Rogue River, Chasta, and other Indians [upon these lands] not included in the terms of [the Executive Order creating] said reservation and by taking the lands as hereinafter described." The "other Indians" are not identified by the petition, or by proof.

Paragraph 12 of the petition states "That by Executive Order of December 21, 1865, the defendant took away from said Indians without authority of law to their great damage said tract No. 479. That by act of Congress March 3, 1875 (18 Stat. 420, 446 [446]), the defendant took away said two tracts each No. 578, leaving only tract No. 579." (See sketch reproduced in finding 15.)

Paragraph 13 of the petition alleges as follows:

"That all of said tribes including bands and tribes having entered into no treaty ratified or unratified claim damages because of violations of agreements, Acts of Congress and executive orders and because of Acts of Congress and executive orders and acts of dispossession relating to realty, personal property, rights of possession, rights to minerals, timber rights, fishing and hunting rights."

No other mention is made in the petition of any specific claim by any particular tribe or band that was a party to any of the ratified treaties mentioned in clause (a) of the jurisdictional act which is claimed to have arisen under or to have grown out of any of the ratified treaties, or which may have arisen under or grown out of any Executive Order or acts of Congress which may have violated any of such ratified treaties. The above-quoted allegations from pars. 11, 12, and 13 of the petition appear to be the sole basis for the claim, or claims, for "damages" made on behalf of the Umpqua, Chinook, Clatsop, and Ne-ha-lum tribes, the Confederated Tribes of the Grand Ronde Community, Oregon, the Willamette Valley Confederated Tribes of Indians, and the Siletz Confederated Tribes of Indians. The petition does not allege and the proof does not show the names of the various tribes and bands from which the last-mentioned three confederated tribes were formed, or which of said predecessor tribes and bands of these confederated tribes had ratified treaties with the Government and which predecessor tribes had not.

The allegations of the petition are, therefore, not sufficient under the terms of the jurisdictional act and the rules of this court to constitute a cause of action against the United States by the last-mentioned seven tribes, made parties plaintiff in the petition, and, notwithstanding this defect in the petition, the evidence submitted is not sufficient to show that any of these seven tribes have a legal or equitable claim for compensation against the United States.

The claims which seem to be made on behalf of these seven plaintiff tribes and,

also, one phase of the claims made on behalf of the tribes and bands of plaintiffs Tillamooks, Coquilles, Too-too-to-neys, and Chetcos appear to be grounded upon the assertion made in proposed findings and briefs of plaintiffs that by the Executive Order of November 9, 1855, the Coast Reservation, consisting of an area 120 miles north and south along the coast of Oregon by 20 miles east and west, composed in part of lands to which the bands of the Tillamooks formerly owned and held original Indian title, was, by the terms of the Executive Order, legally and permanently created as a reservation for the sole exclusive use and occupancy of the Coast, Umpqua, and Willamette Valley tribes of Indians; that the placing on said reservation of Indians not belonging to the Coast, Umpqua, or Willamette tribes constituted a taking in part of the lands legally belonging to said Coast tribes; and also, that the reductions as set forth in the findings of said originally defined Coast Reservation by Executive Order of December 21, 1865 and the act of Congress of March 3, 1875 constituted an unlawful taking without just compensation of lands belonging to said Coast and Umpqua tribes of Indians. It is admitted that the Willamette tribes were not placed on the reservation.

■ These contentions made on behalf of all plaintiffs with respect to beneficial ownership (other than rights based on original Indian title) through alleged exclusive use and occupancy rights in and to the whole of the Coast Reservation, as described under Executive Order of November 9, 1855, cannot be sustained under the terms and conditions of that Executive Order, and the conditions under and the extent to which Congress subsequently in 1875 recognized and ratified said Executive Order.

The unratified treaty dated August 11, 1855, mentioned in clause (b) of the jurisdictional act, which was made with and signed by the tribes and bands of Tillamooks, Sinslaus (Siuslaw), Umpquas, Kowes Bay (Coos Bay), Coquilles, Too-too-to-neys, and the Chetcos, undertook to cede outright to the United States, for the considerations mentioned therein, all lands to which these tribes and bands claimed original Indian title; and it contained a provision immediately following such cession, in art. 1, that so much of the country described therein as ceded as was contained in certain boundaries subsequently specified

"shall, until otherwise directed by the President of the United States, be set apart as a residence for said Indians, and such other bands or parts of bands as may, by direction of the President of the United States, be located thereon." Then followed the provision that "Such tract for the purpose contemplated shall be held and regarded as an Indian reservation, to wit: * * *. All of which tract shall be set apart, and, so far as necessary, surveyed and marked out, for the exclusive use of such Indians as are, or may hereafter be, located thereon; * * *." The intent and purpose of these provisions was to make the whole of such "reservation" public land of the United States subject to use for Indian purposes, to the extent deemed advisable, subject to future reduction; and even if this treaty had been ratified the original tract referred to as a residence or reservation would have been subject to reduction without compensation since under the terms of the cession it would have belonged entirely to the United States and set apart, as stated, for the Indians "until otherwise directed." The Executive Order of November 9, 1855, issued after the treaty had been signed, and all actions thereunder treated this land as public land.

When various other treaties made with various Indian tribes in Oregon were transmitted to the Senate in 1855 for consideration and action, the treaty of August 11, 1855 with certain of the tribes and bands above-mentioned was accidentally and unintentionally overlooked and not transmitted to the Senate until February 11, 1857. In the meantime, and during the period April 18 to October 29, 1855, as shown in finding 13, General Palmer, the Commissioner of Indian Affairs, and the Commissioner of the General Land Office recommended to the Secretary of the Interior for the approval of the President the conditional creation of "A large reservation of land, for the Coast, Umpqua, and Willamette Tribes of Indians of Oregon Territory, as shown by the blue shaded lines on the enclosed diagram taken from the general map" received by the Commissioner of Indian Affairs from General Palmer. The map referred to is in evidence as exhibit 14 to stipulation No. 1. General Palmer had recommended the creation of this conditional reservation on April 18, before he negotiated the 1855 treaty in August. When he made the treaty, the conditional reservation therein

mentioned conformed substantially with his earlier recommendation. The proposed conditional reservation was recommended and created in anticipation that Indian title to the land included therein would be purchased from and ceded by the Indians by the treaty to be negotiated with them and would be, after the issuance of such order, treated as public land of the United States temporarily in use for Indian purposes.

In a letter of October 29, 1855 to the Secretary of the Interior (finding 13), the Commission of Indian Affairs explains in detail that the authority for creation of the proposed conditional reservation by Executive Order was simply a withdrawal of land from public settlement for the time being.

In a letter of November 8, 1855, the Secretary of the Interior submitted to the President for his approval a "proposed reservation for Indians on the coast of Oregon Territory" as had been recommended, and further stated to the President as follows:

"Before submitting the matter to you I desired to have a full report of the subject from the Indian Office, and the letter of the head of that Bureau of the 29th ultimo having been received and considered, I see no objection to the conditional reservation asked for, subject to future curtailment if found proper, or entire relief thereof should Congress not sanction the object rendering this withdrawal of the land from white settlement at this time advisable."

The Executive Order of November 9, 1855, issued pursuant to and in accordance with this letter, stated that "The reservation of the land within the blue shaded lines is hereby made for the purposes indicated in the letter of * * * the Secretary of the Interior of the 8th November 1855."

It will be seen from the above that the reservation of land for Indians was, as stated in the Executive Order, a conditional reservation or a withdrawal of public land from white settlement, subject to future curtailment or reduction if found proper by the President or to entire withdrawal as a reservation for Indians should Congress not sanction, as advisable, the object which rendered the withdrawal from white settlement of the land within the area of the reservation described.

Subsequent actions by the President in the Executive Order of December 21, 1865, and by Congress in the acts of March 3, 1875, 18 Stat. 420, February 8, 1887, 24 Stat. 388, August 15, 1894, 28 Stat. 286, 323, and May 13, 1910, 36 Stat. 367, show that the President and the Congress at all times until 1894 regarded the original "Coast Reservation" described by the Executive Order of November 9, 1855 to be a conditional or temporary reservation for Indian purposes through withdrawal by the President of the land therein from white settlement for the time being, but subject to future curtailment or diminution for purposes of public settlement if the President or the Congress deemed it desirable or advisable to make such curtailment. Therefore none of plaintiff Indian tribes or bands placed on the Coast Reservation, including the Tillamooks tribe, became entitled under and by virtue of the terms and conditions of the Executive Order of November 9, 1855 to recover compensation as for a taking of land to which they had exclusive use and occupancy title under approval and recognition by Congress, when the Coast Reservation, as originally defined by said Executive Order, was subsequently in 1865 and 1875 curtailed or diminished. Sioux Tribe of Indians v. United States, 94 Ct.Cl. 150, affirmed 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501. Congress did not prior to 1894 recognize or approve the so-called Coast Reservation as originally created by Executive Order of November 9, 1855, or as diminished by Executive Order of December 21, 1865, and the act of March 3, 1875, supra, as a reservation of land for the sole and exclusive use and occupancy by the Indians thereon in such way or to such extent as would give them beneficial ownership of, or use and occupancy title to, any portion thereof, until the passage of the general allotment act of February 8, 1887, supra, and the acts of August 15, 1894, 28 Stat. 286, 323, sec. 15; May 13, 1910, supra, and May 18, 1916, 39 Stat. 123, 149.

On and after enactment of sec. 15 of the act of August 15, 1894, supra, Congress approved and recognized the Coast or Siletz reservation as it existed immediately prior thereto as beneficially belonging to the Indians thereon. After this act of August 15, 1894, approving an agreement ceding 178,840 acres for $142,600, Congress did not take any part of the reservation with-

out compensation, but by that act and under sec. 3, act of March 3, 1871, 16 Stat. 544, 570, it recognized the reservation as belonging to the Indians thereon.

From these conclusions, it results that the Umpqua, Chinook, Clatsop, and the Ne-ha-lum tribes and the Confederated Tribes of the Grand Ronde Community, Oregon, the Willamette Valley Confederated Tribes of Indians, and the Siletz Confederated Tribes of Indians are not entitled to recover.

Moreover, and in any event, the Umpqua Tribe is not entitled to recover because it is expressly excluded under clause (b) of the jurisdictional act. The Chinook, Clatsop, and Ne-ha-lum tribes are not entitled to recover as for a taking of lands to which they may have had original Indian title for the further reason that their unratified treaties made in 1851 are not included in the jurisdictional act, and also for the reason that under the acts of June 7, 1897, 30 Stat. 62, and August 24, 1912, 37 Stat. 518, 535, they were paid various sums by Congress which were accepted by them in full of all demands or claims against the United States. Klamath and Moadoc Tribes of Indians et al. v. United States, 296 U.S. 244, 56 S.Ct. 212, 80 L.Ed. 202. The Willamette Tribe of Indians or the "Confederated Bands of Indians of the Willamette Valley" as they were known and designated in a ratified treaty with them dated January 22, 1855, 10 Stat. 1143, were not brought to or placed upon the Coast Reservation, and they cannot, therefore, sue under clause (a) or (b) of the jurisdictional act or under the Executive Order of November 9, 1855.

The evidence does not show of or from what tribes or bands the Confederated Tribes of the Grand Ronde Community, the Willamette Confederated Tribes, and the Siletz Confederated Tribes, made plaintiffs herein, were composed or organized; neither does the evidence show when the Indians, from which the so-called Confederated Tribes of the Grand Ronde Community and the Siletz Confederated Tribes were organized, were moved to or placed upon the Coast Reservation, other than that the Rogue River and Chasta Indians, who appear to have belonged to the so-called Siletz Confederated Tribes, were placed thereon in May 1857.

The petition is therefore dismissed as to the following plaintiffs: The Umpqua, Chinook, Clatsop, and Ne-ha-lum tribes, the Confederated Tribes of the Grand Ronde Community, Oregon, the Willamette Valley Confederated Tribes of Indians, and the Siletz Confederated Tribes of Indians.

The next question involves the right of the Tillamook, Coquille, Too-too-to-ney, and Chetco tribes to recover compensation on the basis of original Indian title to the lands which they claim the Government took in November 1855, or soon thereafter.

Counsel for defendant do not deny that the United States took Indian title to the lands involved to the extent that the Indians may have had such title, but they contend, first, that if it be assumed that each of the four tribes above-mentioned has proven original Indian title through use and occupancy to the exclusion of other Indian tribes of the lands claimed by them they are not entitled to recover compensation therefor for the reason that no right, title, or interest in, to, or upon the whole or any part of such lands as against the sovereign rights of the United States may be acquired by an Indian tribe or be recognized by the court as a basis for judgment in the absence of specific Congressional recognition of beneficial ownership through original title; and, that the United States has never recognized any of these plaintiffs as having such a right, title, or interest in, to, or upon any lands so occupied by them. In support of this contention counsel cites, among others, the opinions of this court in Coos Bay Indian Tribes et al. v. United States, 87 Ct.Cl. 143; Duwamish et al. v. United States, 79 Ct.Cl. 530; and The Wichita Indians et al. v. United States, 89 Ct.Cl. 378, 416.

Before analyzing these cases we will discuss the above contention in the light of other decided cases and the history of the aboriginal right or title of Indian tribes in and to property exclusively possessed by them, as uniformly recognized by the United States.

The contention of counsel for defendant is but another way of saying that an act authorizing suit on original Indian title simply provides a forum and that Indians cannot recover compensation from the United States as for a taking of their original possessory title to lands unless such title to the area, with respect to which claim is made, has been expressly recognized or conceded by the United States through some treaty, agreement, or act of Congress.

From the standpoint of the legal and equitable nature of a claim and the legal principles applicable thereto, the fundamental right of an Indian tribe to recover compensation for having been deprived by the United States of the beneficial aboriginal ownership of land is no different in a case where the United States has consented to be sued on the basis of original Indian title from a case where the United States has consented to be sued on the basis of a claim arising under or growing out of a treaty, agreement, or act of Congress, except in the nature and degree of proof required to establish use and occupancy title. Where consent to be sued on the basis of original Indian title has been given, as in this case, occupancy of these Indians to the exclusion of other tribes necessary to establish aboriginal possessory title is a "question of fact to be determined as any other question of fact." United States, as Guardian of the Hualpai Indians of Arizona, v. Santa Fe Pacific Rail-Road Co., 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260. Cf The Assiniboine Indian Tribe v. United States, 77 Ct.Cl. 347; Coos (or Kowes) Bay, Lower Umpqua (or Kalawatset), and Siuslaw Indian Tribes v. The United States, 87 Ct.Cl. 143. But where the consent to be sued is limited to a claim, or claims, arising under or growing out of a treaty, agreement, or act of Congress, proof of aboriginal use and occupancy title is not necessary where such treaties, agreements, or acts of Congress specifically provide or recognize that the land in respect of which claim is made has been or is set apart for the exclusive use and occupancy of the tribes concerned, or jointly for them and other tribes with their consent. Shoshone Tribe v. United States, 82 Ct.Cl. 23; 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360. In the case of a treaty title, the Indians concerned simply reserve, by specific recognition in the treaty, their original title to certain of their lands, or acquire exclusive use and occupancy title to other lands, in exchange for lands to which they had held original Indian Title. Where the consent to be sued is limited to claims arising under or growing out of a treaty, and the treaty relied upon is only a treaty of peace and amity and does not admit or recognize an exclusive use and occupancy title of the Indians to the lands in respect of which claim is made, the court is without authority to determine, adjudicate, and render judgment upon the basis of aboriginal Indian title. Duwamish, et al. Tribes of Indians v. United States, 79 Ct.Cl. 530. The Crow Nation or Tribe of Indians of Montana v. United States, 81 Ct.Cl. 238; The Wichita Indians, et al. v. United States, supra; and The Northwestern Bands of Shoshone Indians v. United States, 95 Ct.Cl. 642, affirmed March 12, 1945, 324 U.S. ——, 65 S. Ct. 690. And even if the proof is sufficient, in a case where the right to sue is limited to claims arising under or growing out of treaties, to show that the tribe or tribes concerned had original Indian title through use and occupancy to the exclusion of other Indian tribes, the court cannot enter judgment on the basis of such original title. The Northwestern Bands of Shoshone Indians v. United States, supra; Duwamish, et al. v. United States, supra; The Wichita Indians, et al. v. United States, supra.

Ever since the Government of the United States was first established the United States through its legislative and executive departments has, with one qualified exception in the case of the Indians of California, consistently conceded and recognized that Indians had a beneficial possessory ownership in lands used and exclusively occupied by them, notwithstanding general consent to be sued by the Indians on the basis of such original occupancy title or on a treaty title was not given. Johnson and Graham's Lessee v. William McIntosh, 8 Wheat. 543, 5 L.Ed. 681; Cramer et al. v. United States, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622; United States v. Santa Fe Pacific R. Co., supra.

In practically all instances the special consent given by Congress from time to time to particular tribes to sue the United States has been limited to claims arising under or growing out of treaties, agreements, or acts of Congress, but in Johnson v. McIntosh, supra, the court held, 8 Wheat. at page 574, 5 L.Ed. 681, that the Indians "were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil, at their own will, to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it." This case further pointed out that the character of the Indians inhabiting this country and their mode of life and subsistence were such that it was not practicable for them

to be incorporated with the people of the victorious nation that had discovered and was taking possession of the continent and become subjects, or citizens, of the Government, with whom they were connected, in accordance with the general rule dictated by humanity and a wise policy which requires "that the rights of the conquered to property should remain unimpaired; that the new subjects should be governed as equitably as the old, and that confidence in their security should gradually banish the painful sense of being separated from their ancient connections, and united by force to strangers."

The hundreds of treaties and agreements made with Indian nations or tribes, commencing as early as 1778, all indicate, to a greater or lesser degree, a complete recognition by the United States of the legal principle established by the cases last-above cited. The provisions of sec. 8, art. 1 of the Constitution giving to Congress power to regulate commerce with the Indian tribes and the practice of the Government over a long period of years in making treaties with such tribes under sec. 2, art. 2 of the Constitution seem to have been predicated upon the principle that the Indians had a beneficial ownership in lands occupied, used, and exclusively possessed by them, and that such right of occupancy through aboriginal possession should, in order to give the United States full legal ownership, be extinguished by purchase through ratified treaties, agreements, or acts of Congress made and enacted pursuant to the power of Congress over the property and affairs of Indian tribes for their benefit.

In United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 345-347, 62 S.Ct. 248, 251, 86 L.Ed. 260, the court said:

"Occupancy necessary to establish aboriginal possession is a question of fact to be determined as any other question of fact. If it were established as a fact that the lands in question were, or were included in, the ancestral home of the Walapais in the sense that they constituted definable territory occupied exclusively by the Walapais (as distinguished from lands wandered over by many tribes), then the Walapais had 'Indian title' which, unless extinguished, survived the railroad grant of 1866. Buttz v. Northern Pacific Railroad, supra, [119 U.S. 55, 66, 7 S.Ct. 100, 104, 30 L.Ed. 330].

" 'Unquestionably it has been the policy of the federal government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States.' Cramer v. United States, 261 U.S. 219, 227, 43 S.Ct. 342, 344, 67 L.Ed. 622. This policy was first recognized in Johnson v. McIntosh, 8 Wheat. 543, 5 L.Ed. 681, and has been repeatedly reaffirmed. Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483; Mitchel v. United States, 9 Pet. 711, 9 L.Ed. 283; Chouteau v. Molony, 16 How. 203, 14 L.Ed. 905; Holden v. Joy, 17 Wall. 211, 21 L.Ed. 523; Buttz v. Northern Pacific Railroad, supra; United States v. Shoshone Tribe, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213. As stated in Mitchel v. United States, supra, 9 Pet. [711] at page 746, 9 L.Ed. 283, Indian 'right of occupancy is considered as sacred as the fee-simple of the whites.' Whatever may have been the rights of the Walapais under Spanish law, the Cramer case assumed that lands within the Mexican Cession were not excepted from the policy to respect Indian right of occupancy. Though the Cramer case involved the problem of individual Indian occupancy, this Court stated that such occupancy was not to be treated differently from 'the original nomadic tribal occupancy.' 261 U.S. [219] at page 227, 43 S.Ct. [342], 67 L.Ed. 622. Perhaps the assumption that aboriginal possession would be respected in the Mexican Cession was, like the generalizations in Johnson v. McIntosh, supra, not necessary for the narrow holding of the case. But such generalizations have been so often and so long repeated as respects land under the prior sovereignty of the various European nations including Spain, that like other rules governing titles to property (United States v. Title Insurance & Trust Co., 265 U.S. 472, 486, 487, 44 S.Ct. 621, 623, 68 L.Ed. 1110) they should now be considered no longer open. * * *

"Nor is it true, as respondent urges, that a tribal claim to any particular lands must be based upon a treaty, statute, or other formal government action. As stated in the Cramer case, 'The fact that such right of occupancy finds no recognition in any statute or other formal governmental action is not conclusive.' 261 U.S. [219] at page 229, 43 S.Ct. [342], 67 L.Ed. 622."

If, in a suit by Indians against the United States pursuant to a special jurisdictional act, evidence of direct recognition by the United States that the Indians had property rights or a beneficial

ownership in lands based on original Indian title through exclusive possession and occupancy of such lands were necessary, it would be sufficient in the case at bar to point to the act of August 14, 1848, 9 Stat. 323, which made all land laws of the United States applicable to the Territory of Oregon thereby created, and in section 1 stated that nothing therein contained "shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, * * *." Further, in an opinion on the question of original Indian title to lands and the right of settlement thereon as public lands, the Attorney General on June 5, 1855 (7 Op.Atty.Gen. 293, 299), stated and held that "There is one other idea suggested by the Commissioner of Indian Affairs, and the documents he communicates, as being current in Oregon, namely, that any white settler may rightfully take possession of any of the lands occupied by the Indians, and oust them prior to the extinguishment of their occupancy-title by the United States. This idea is too absurd to admit of reasoned reply. Suffice it to say that a white settler has the same right thus to oust the Indians as he has to oust white men, and no more; that is, the right to substitute robbery for purchase, and violence for law."

 The United States, of course, possessed power, whether or not its action was just and legal from the standpoint of fundamental property rights of Indians, to deprive the Indians, by force or otherwise, of their property rights in and beneficial ownership of lands occupied by them, and to move them about as it pleased, and in the absence of a consent by the United States to be sued the courts cannot interfere or adjudicate a claim for compensation on the basis of such action; the only recourse of the Indian in such a case being to petition Congress for relief. But the situation is entirely different where, as in a case like the present one, Congress has given the consent of the United States to be sued on claims for compensation based on original Indian title or rights in, to, or upon lands occupied by them arising under or growing out of such action by the United States. When such consent to be sued has been given, ordinary principles of law and equity, so far as applicable, govern the rights of the parties.

It will be found upon analysis that the cases in this court hereinabove mentioned and chiefly relied upon by the defendant do not support the contention that recovery cannot be had on the basis of original Indian title unless and until Congress has specifically recognized such title.

The jurisdictional act in the Coos Bay Indian Tribes et al., supra, chiefly relied upon by defendant, like clause (b) of the jurisdictional act in the present case, authorized the Indians to bring suit on claims growing out of original Indian title, and the court assumed in deciding the case that if plaintiff tribes had established by sufficient evidence such original Indian title through exclusive use and occupancy they would be entitled to recover compensation, but held that the evidence submitted in that case was not sufficient to establish such title to the area claimed, or to any definite portion thereof. The statement by the court in its opinion that the United States had never recognized the Coos Bay and other Indian tribes, plaintiffs in that suit, as the aboriginal owners of lands to which they made claim had reference to the proposition that since plaintiffs had not established aboriginal use and occupancy title they were not otherwise entitled to recover as for a taking of such lands by the Government, because the Government had not specifically recognized by treaty, agreement, or act of Congress, beneficial ownership of the Indians through their exclusive right to use and occupy the whole or any portion of the lands for which claim was made.

In the case of The Duwamish et al. Tribes, supra, the suit was brought under a jurisdictional act, sec. 1 of which provided for adjudication of claims arising under or growing out of certain treaties or acts of Congress, and did not authorize the prosecution of a claim based on aboriginal Indian title. The portion of the opinion in that case relied upon by counsel for defendant discussed sec. 2 of the jurisdictional act which the Indians claimed had enlarged the jurisdiction conferred by sec. 1, and simply pointed out that the Indians as a tribe were vested with no right to sue the United States for the taking of their lands until subsequent to the conclusion of treaties which fixed their landed domain, and only then by special jurisdictional acts of Congress in cases where allegations prevailed that treaty-stipulations had not been observed, or that acts of

Congress had deprived them of lands included in their reservations. The Duwamish case did not hold or intend to hold that an Indian tribe could not recover compensation on the basis of original Indian use and occupancy title as for a taking if the jurisdictional act authorized the bringing of a suit and rendition of judgment for compensation on the basis of such original title.

The opinion in the case of the Wichita Indians, supra, held that the claims asserted under certain treaties or acts of Congress, as authorized by the jurisdictional act, could not, on the evidence, be sustained, and that a claim based solely on aboriginal Indian use and occupancy title was not within the terms of the jurisdictional act.

In the case of The Assiniboine Indian Tribe v. United States, 77 Ct.Cl. 347, in which the jurisdictional act authorized suit on the basis of original Indian title, we held that the Indians would be entitled to recover for the taking of their lands if they were able to prove that they held original title through exclusive use and occupancy, but it was held that they had not proved such exclusive occupancy title.

 We are therefore of opinion that plaintiffs Tillamook, Coquille, Too-too-to-ney, and Chetco tribes are entitled as a matter of law to recover compensation if they have proven by satisfactory evidence that they held and owned original Indian occupancy title to the exclusion of other Indian tribes to the lands of which they were deprived and which were taken by the United States without payment of compensation, and this is the final question in the case. Counsel for defendant, relying upon the Coos Bay et al. case, supra, contend that original Indian title has not been established by the proof.

 From a careful study of the evidence submitted, a great deal of which is documentary, we are of opinion that these four tribes have satisfactorily established original Indian title through exclusive use and occupancy in 1855, and long prior thereto, to the lands specifically described in findings 8, 9, and 10.

On this question, counsel for the Government contend that although defendant is satisfied that the four tribes mentioned were living during and prior to 1855 in the general area of the lands claimed by them,

defendant does not concede that these plaintiffs, or any of them, exclusively occupied the lands which they claim in such a manner or to such an extent as would create or would be considered a possession either actual or constructive.

The four plaintiffs above mentioned have submitted a great deal more and much stronger evidence than was before the court in the Coos Bay case in which the court had to rely principally upon oral testimony which it found insufficient to establish the claimed original title through exclusive use and occupancy. No useful purpose would be served by discussing in detail the evidence submitted in this case—reference to the principal portions thereof will be sufficient.

The investigations and reports made and submitted in 1855 by Indian Superintendent Joel Palmer under and pursuant to direction and instruction of the President, through the Commissioner of Indian Affairs, substantially support the claim made by the Tillamooks, Coquille, Too-too-to-ney, and Chetco tribes in respect of the lands for which they claim compensation and to which they claim to have held original Indian title in 1855 and long prior thereto. He found and reported that these tribes and bands occupied areas with definite boundaries, and the proof which has been submitted in this case satisfactorily shows where these definite boundaries were with respect to the tribes composed of the bands mentioned in the petition. General Palmer's investigations and reports not only recognized the extent of occupancy by these tribes, but he also concluded that by such occupancy they had acquired original Indian title. Other evidence which has been submitted in the case fully supports this view and further shows that as far back as history can be traced, at least to 1750, there had been practically no change in location of plaintiff tribes and bands along the Oregon Coast, and east to the Coast Range Mountains; and that these tribes and bands held, occupied, and used such lands within rather definite boundaries to the exclusion of and in recognition by other tribes and bands. The proof satisfactorily shows that plaintiff tribes of Tillamooks, Coquilles, Too-too-to-neys, and Chetcos lived upon, claimed, and occupied these lands in Indian fashion to the extent that Indian tribes and bands usually exclusively used and occupied lands

prior to 1855 and as far back as the history of these tribes and bands can be traced.

The written report prepared by the Secretary of the Interior in the case at bar from the records and documents in the possession of the Government, which report is filed as evidence in this case, states that the lands which the Indians undertook to cede in the unratified treaty of August 11, 1855, and for which these plaintiffs make claim, appear to have been in the exclusive possession of the Indians.

A map showing tribal distribution of Indians in Oregon, including the Coast tribes, among which were plaintiffs Tillamook, Coquille, Too-too-to-ney, and the Chetco, prepared by the American Anthropological Association after investigation and study of the history of these Indian tribes, is reproduced below:

The conclusion reached by this Association from its investigation and research, as disclosed by its official records, shows that this tribal distribution represented a fairly stable condition which had existed from about 1750.

In addition to the foregoing, we have in this case the testimony of Dr. John P. Harrington of the Smithsonian Institution, an eminent ethnologist of a quarter of a century of service in the Bureau of American Ethnology, in connection with the investigations and studies he had made and completed of the Oregon Indians, including the Oregon Coast Indians and plaintiff tribes of Tillamooks, Coquilles, Too-too-to-neys, and Chetcos. Dr. Harrington testified that from an investigation and study of the history of the Indians of the Oregon Coast and their holdings he had been convinced beyond any shadow of a doubt that these tribes and bands of Indians which fringed the Coast were the ancient and original inhabitants, and that if an investigation had been made centuries before the expedition of Lewis and Clark the tribal holdings would have been to all intents and purposes where they were at the dawn of history.

The defendant has submitted no evidence to contradict or overcome this strong and direct evidence which has been submitted on behalf of these plaintiffs in support of their claim of original Indian exclusive use and occupancy title of the lands for which they claim compensation.

These plaintiffs are therefore legally and equitably entitled to recover compensation from the defendant for the taking of lands, as set forth and described in findings 8, 9, and 10, to which they have shown they held original Indian title from time immemorial.

As to the date or dates of taking of these lands by the defendant, the following is established by the evidence submitted:

To all intents and purposes, and as a matter of established fact, the United States considered soon after the unratified treaty dated August 11, 1855, was made and when the Executive Order of November 9, 1855, was issued that the lands claimed and occupied by the tribes and bands of Tillamooks, Coquilles, Too-too-to-neys, and Chetcos were public lands for such purposes as the United States might desire to use them—namely, for public homestead and settlement, and for temporary use for Indian purposes.

The executive officers of the Government, of course, thought and assumed that the treaty which was being negotiated, and which was made and signed with these four tribes between August 11 and September 8, 1855, and before the Executive Order of November 9, 1855, would be ratified by the Senate but they did not await ratification before taking the lands, but proceeded immediately after the treaty was signed to regard and to treat the lands claimed by the Tillamooks, Coquilles, Too-too-to-neys, and the Chetcos as public lands open to public homestead and settlement, except as conditionally withdrawn and reserved by the Executive Order of November 9, 1855. This action, subsequently confirmed by Congress, was a taking of the lands and the original Indian use and occupancy title. Such action was not altered but was confirmed and continued when it became known that the treaty dated August 11, 1855, would not be ratified. Such actions were known to, acquiesced in, and ratified by Congress, as hereinafter set forth.

The tribes and bands of the Coquilles, Too-too-to-neys, and the Chetcos were entirely moved off their lands about November 9, 1855, or soon thereafter, and placed on a portion of the land to which the tribe and bands of Tillamooks held original Indian title. The lands of the Coquille, Too-too-to-ney, and Chetco tribes were therefore unquestionably taken at that time.

The bands composing plaintiff Tillamooks tribe were not altgether moved off their land, but they were moved and confined to the conditional reservation created by the Executive Order of November 9, 1855, along with other Indians of various other tribes and bands, and such of the land of the Tillamooks tribe as lay east of the eastern boundary of this conditional reservation was taken November 9, 1855. This conditional reservation for Indian purposes was, as has been stated, composed in part of a portion of the land to which plaintiff tribe and bands of Tillamooks held original Indian title and which they continued to occupy jointly with other Indians; this land of the Tillamooks was also taken by the United States at the same time the other lands above-mentioned were taken. The land composing the reservation was treated and regarded from November 8, 1855 as public land of the United States subject to

be opened for public settlement as the President or Congress might direct, and most of it was subsequently so opened for settlement.

The above-described actions of the Executive officers of the Government, dating from November 9, 1855, in carrying out the Executive Orders of 1855 and 1865, were ratified and confirmed by Congress by the passage of the act of March 3, 1875, 18 Stat. 420. This ratification of the 1855 and 1865 Executive Orders confirmed the original taking as of November 9, 1855. The land originally belonging beneficially to the tribes and bands of Tillamooks, Coquilles, Too-too-to-neys, and Chetcos through orginal Indian title was therefore taken on November 9, 1855. Shoshone Tribe of Indians of the Wind River Reservation in Wyoming v. United States, 82 Ct. Cl. 23, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360; and 85 Ct.Cl. 331, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213.

The compensation to which these tribes are entitled should therefore be measured by the value of . the lands described in findings 8, 9, and 10 on that date, plus an additional amount measured by a reasonable rate of interest to make just compensation. However, these four tribes are not legally and equitably entitled to recover the entire value above mentioned, since those values must be offset as of November 9, 1855 by the values as of that date of their interests in the land comprising the reservation on August 15, 1894, of which interests the Indians of these tribes then became the beneficial owners through recognition by Congress on the basis of allotments in severalty which had been made and on the basis of population as to unallotted lands or proceeds therefrom. In effect, and for all practical purposes, these Indians, so far as their right to compensation is concerned, had had these occupancy interests (first recognized on August 15, 1894, as being exclusive as against the United States) in the land of the reservation from the date of taking in November 1855, but the extent of such interests were, until 1894, uncertain, indefinite, and legally indeterminable until Congress by the act of August 15, 1894, ratifying an agreement of purchase by the United States of a portion of the then existing reservation, recognized the Indians on the then existing reservation as being the beneficial owners thereof. This act of 1894 was a recognition by ratification as of November 9, 1855 of such interests as the Indians had in 1894, and which interests they had actually enjoyed through occupancy since 1855. The values as of November 9, 1855 of such interests as these plaintiffs had on August 12, 1894 are therefore proper legal and equitable offsets against the values of the lands taken in November 1855.

Although the Tillamooks originally held Indian title to their interest in the reservation as it existed in 1894, such title had been taken in 1855, but they were not deprived of possession to the extent of that interest, and their exclusive use and occupancy title to such interest again became vested and determinable in 1894.

As to the Coquilles, Too-too-to-neys, and the Chetcos, their exclusive use and occupancy interests in the reservation, which became vested by recognition in 1894, represented an equitable consideration in part for their lands which had been taken by the Government in 1855, and which interests they had enjoyed through actual occupancy since the date of taking of their lands about November 9, 1855.

Judgments for the amount of compensation to which plaintiff tribes and bands of Tillamooks, Coquilles, Too-too-to-neys, and Chetcos may be entitled and the determination of the amount of offsets, in addition to those above-mentioned, if any, are reserved for further proceedings under rule 39(a).

It is so ordered.

MADDEN and WHITAKER, Judges, concur.

WHALEY, Chief Justice, dissents.

JONES, Judge, took no part in the decision of this case.