**QUAPAW TRIBE OF INDIANS et al.**
v.
**UNITED STATES.**
No. 1–52.

United States Court of Claims.

Decided April 6, 1954.

284

Lloyd E. Roberts, Vern E. Thompson, Joplin, Mo., for appellants. Byron Hoffman, Miami, Okl., was on the brief.

Leland L. Yost, Washington, D. C., Theodore W. Glocker, Albuquerque, N. M., with whom was Acting Asst. Atty. Gen., Ralph J. Luttrell, for appellee.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

LITTLETON, Judge.

The Quapaw Tribe of Indians [1] has appealed to this court from a final determination of the Indian Claims Commission adverse to that tribe's claim contained in Count I of its petition (immemorial occupancy and possession), and also from the Commission's determination allowing certain offsets in the sum of $48,592.73 from the amount found to be due the tribe in connection with Count II. The Government has filed a cross appeal from the Commission's final determination in favor of the tribe under Count II, with respect to a treaty reservation.

### Count I

Count I is asserted under Section 2(3) of the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C.A. § 70, on the ground that the consideration provided for in the treaty of August 24, 1818, 7 Stat. 176, and paid by the United States to the Quapaw Tribe for 43,520,888.24 acres of land embraced in a gen-

1. The petition before the Indian Claims Commission was filed by Paul Goodeagle, Louis A. Imbeau and Sam Douthit, as the representatives as far as permitted by law of all members of said tribe and all persons who shall be found entitled to participate in any judgment which may be rendered herein, same being members of a class too numerous to be joined herein.

eral cession of any right, title or interest, to the United States by the tribe, was grossly inadequate and unconscionable within the meaning of the Act.[2] The tribe asks for a revision of the treaty as to the price for this general cession. The Indian Claims Commission made and entered findings of fact and rendered an opinion and determined that appellant-tribe was not entitled to recover on this Count I, because the tribe had not established by sufficient evidence that it had exclusively possessed and occupied from time immemorial, and at the time of the 1818 cession, all or any definable part of the large area included in the general cession.

The appellant-tribe urges that the Commission has erred in that its findings of fact contain only ultimate facts as distinguished from basic or primary facts, as requested by the tribe in its proposed findings, and that in any event the ultimate findings made and the decision of the Commission are not supported by substantial evidence. From a careful examination of the record we cannot agree with appellants, and from a study of the record we find that the findings of the Commission are sustained by substantial evidence.

In finding 1 the Commission found that the Quapaw Tribe was first discovered by the DeSoto Expedition, in 1541, along the west bank of the Mississippi River, extending from the vicinity of the St. Francis River south to the Arkansas River, with a few of the tribe residing on the east side of the Mississippi; that around the year 1700, the entire tribe was on the area west of the Mississippi with the tribe's principal village located at the confluence of the St. Francis and Mississippi Rivers; that the tribe then began moving southward, and by the year 1805 was located along the south bank of the Arkansas River in several villages extending from the junction of the Arkansas and the Mississippi Rivers for a distance of about one hundred miles to the vicinity of what is now known as Little Rock, Arkansas; that they remained between Little Rock and Arkansas Post, the latter being about 15 miles west of the Mississippi River, until the time of the treaty of August 24, 1818; that the population of the tribe had diminished from 5,000 or 6,000 members in 1541, to approximately 500 members at the time of the 1818 treaty. They had therefore ceased to occupy and possess and use much of the area occupied in the Indian manner many years before.

In finding 2, the Commission found that in 1818 the United States wished to acquire some of the lands claimed by the Quapaw west of the Mississippi to provide a home for other Indians then living east of that river; that the Secretary of War appointed two commissioners to treat with the Quapaw for the extinguishment of their use and occupancy, claims except such land as might be reserved by treaty for their occupancy and use; that pursuant to instructions issued by the Secretary of War, the Treaty Commissioners concluded a treaty with the Quapaw Indians on August 24, 1818, 7 Stat. 176, by which the Quapaw ceded and relinquished to the United States all their claims to lands both east and west of the Mississippi, except for a reservation of 1,163,604.75 acres. This tract consisted of the area which the Commission believed was sufficient for the needs of the tribe and which they also found was the area which the tribe at the time of the treaty in 1818 had and for many years past, occupied and used in such fashion as to show Indian use and occupancy right, the fee title having always been in the United States.

In its third finding, the Commission found that in 1818 the Quapaw were oc-

---

2. Section 2(3) provides in part as follows:

    The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe * * * (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of * * * unconscionable consideration * * *. 25 U.S.C.A. § 70a(3).

cupying an undefined territory within the boundaries of the 1,163,604.75 acres of the lands reserved by Article 2 of the treaty and further found, from the whole record, that the tribe did not at that time and had not for many years past actually occupied and exclusively possessed *any* part of the 43,520,888.24 acres of land described in and ceded and relinquished by the treaty. Indian tribes, in the absence of a treaty reservation, have only an occupancy and use title, or right, the fee being in the United States, and when an Indian tribe ceases for any reason, by reduction of population or otherwise, to actually and exclusively occupy and use an area of land clearly established by clear and adequate proof, such land becomes the exclusive property of the United States as public lands, and the Indians lose their right to claim and assert full beneficial interest and ownership to such land; and the United States cannot be required to pay therefor on the same basis as if it were a recognized treaty reservation. Johnson v. M'Intosh, 8 Wheat. 543, 21 U.S. 543, 5 L.Ed. 681; Cramer v. United States, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622; United States v. Santa Fe Pacific Railroad Co., 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260; Northwestern Bands of Shoshone Indians v. United States, 95 Ct.Cl. 642; Coos Bay Lower Umpqua and Siuslaw Indian Tribes v. United States, 87 Ct.Cl. 143; Alcea Band of Tillamooks v. United States, 59 F.Supp. 934, 103 Ct.Cl. 494, 541–563.

We find that the findings and conclusions of the Indian Claims Commission on Count I of appellants' claim are supported by substantial evidence. The Commission's findings and decision are, therefore, affirmed.

## Count II

■■ In its second cause of action appellant-tribe sought recovery on the ground that the amount paid by the Government to the tribe for its 1818 treaty lands sold to the Government by the treaty of November 15, 1824, 7 Stat. 232, was grossly inadequate within the mean-

ing of clause (3) of Section 2 of the Indian Claims Commission Act. The Commission found that the Indians received, under this treaty, $28,037 for 1,161,284.75 acres of the reservation acquired by the Government, or 2.4 cents per acre, whereas the true value of this land in 1824 was 85 cents per acre. The Commission concluded, and we think correctly upon the record, that the sum paid was grossly inadequate and determined that the tribe was entitled to an award of $987,092 less such offsets, if any, as might be allowable.

The Government has cross-appealed from the Commission's determination on Count II, assigning as errors (1) the Commission's failure to hold that the Quapaw Indians had waived their right to claim fraud in the execution of the 1824 treaty, by entering into the treaty of May 13, 1833, 7 Stat. 424, under which it accepted substantial benefits conferred by that new or "supplementary" treaty, and (2) in the alternative, in not taking into consideration the sums paid under the 1833 treaty in making its determination of whether or not the terms of the 1824 treaty were unconscionable.

Both of defendant's contentions are based upon the premise that the treaties of 1824 and 1833, were not two separate transactions but rather one, the 1833 treaty being supplemental to or in modification of the 1824 treaty.

Pursuant to the 1824 treaty, the Quapaw ceded to the United States the lands formerly reserved to their exclusive occupancy and use in the 1818 treaty and agreed to move to a district of country inhabited by the Caddo Indians in Oklahoma and to form a part of that tribe. As pointed out by the Commission, the United States was not required by the 1824 treaty to provide the Quapaw with any land in the Caddo country and did not do so, for the land the Quapaw moved to and occupied therein was given to them by the Caddo Indians. In Article II of the 1824 treaty, the Government granted the Quapaws a temporary annuity of one thousand dollars a year for 11 years to be "in addition" to their present annui-

ties. (See Article V of the 1818 treaty providing for a perpetual annuity of $1,000 a year.) In Article V of the 1824 treaty the Government agreed to furnish the Quapaws up to $1,000 to be expended by their agent, to facilitate the transportation and movement of the Tribe to the Caddo country, and also to furnish the Quapaws with corn, meat and salt for six months from January 1, 1826 (the tribe agreed to commence its move on January 20, 1826). A tract of land was reserved out of the 1818 reservation to one James Scull in consideration of the Quapaw's debt of $7,500 to him, and certain tracts of land from the Quapaw reservation in Arkansas were granted to other persons of Indian descent. The Commission found that the Government performed all its obligations under the 1824 treaty. (Finding 14 of the Commission's Additional Findings of Fact, entered January 3, 1952.)

The preamble to the treaty of May 13, 1833, between the Quapaw Indians and the United States, relates the circumstances leading up to the negotiation of this treaty. It states that in accordance with their promise in the 1824 treaty, the Quapaws removed to the Caddo district and settled on land given them by the Caddo on the Bayou Treache on the south side of the Red River; that the land was found to be subject to frequent inundations so that the Quapaw crops were destroyed; that the country was unhealthy and many of the Quapaws died as a result; that since the Quapaws could obtain no substitute land from the Caddos who refused to take them into their tribe, the Quapaws had "no alternative but to perish if they continued there, or to return to their old residence on the Arkansas;" that upon returning to their old residence on the Arkansas, "they now find themselves very unhappily situated in consequence of having their little improvements taken from them by the settlers of the country; and being anxious to secure a permanent and peaceable

home the following articles or treaty are agreed upon between the United States and the Quapaw Indians by John F. Schermerhorn * * *."

The treaty then provided for the cession by the Quapaws to the United States of whatever right and title and interest they had to the lands "given them by the Caddo Indians on the Bayou Treache of Red River". Article II provided that the United States would convey to the Quapaws one hundred and fifty sections of land west of Missouri between the lands of the Senecas and Shawnees, to be selected for them by the Commissioners of Indian Affairs West. In Article III the United States agreed, "in consideration of the important and extensive cessions of lands made by the Quapaws to the United States and in view of their present impoverished and wretched condition," that the Quapaws should be moved to their new homes at the expense of the United States and would be supplied with one year's provision from the time of their removal. In the same article the Government agreed to furnish cows and other farm animals, as well as farm implements, blankets, rifles, etc., and to provide a farmer for their instruction, a blacksmith and blacksmith shop. The Government also agreed to appropriate a thousand dollars a year for the tribe's education. In Article IV, it was provided that in lieu of and in full consideration for the Quapaw's present annuities, "perpetual and limited,"[3] the Government would pay the debts of the Quapaw Indians in accordance with a schedule annexed to the treaty and would give them an annuity of $2,000 a year for twenty years.

Article V of the treaty contains the language on which the Government principally relies in urging that the 1833 treaty was in reality a part of the 1824 treaty. That article provides in part as follows:

"It is hereby agreed, and expressly understood, that this treaty is

---

3. Article V of the 1818 treaty provided for a perpetual annuity, and Article II of the

1824 treaty provided for a limited annuity (for eleven years).

only supplementary to the treaty of 1824, and designed to carry into effect the views of the United States in providing a permanent and comfortable home for the Quapaw Indians  *  *  *."

The permanent and comfortable home which the Quapaw tribe had under the 1818 treaty had been taken from them.

We do not think that the above statement is controlling on the question of whether the 1833 treaty was a mere addition to the 1824 treaty. The 1833 treaty may have been supplemental to the 1824 treaty in attempting to carry out the Government's desire to see the Quapaws settled in a permanent and adequate home *outside of Arkansas*, a plan which was not fulfilled because of the facts already described and noted in the preamble to the 1833 treaty. However, as the Commission has pointed out, each specific provision of the 1824 treaty was completely carried out by both parties and in all material respects the 1833 treaty was an entirely new and separate agreement and transaction.

The United States was under no legal obligation to do anything further under the 1824 treaty or to make any supplemental agreement with respect to it. In the 1824 treaty the Government bought and paid a certain sum for lands belonging to the Quapaw in Arkansas. In the 1833 treaty it took a conveyance of the Quapaw lands in Oklahoma and paid something for such lands by conveying the Quapaw lands owned by the Government in the northeastern corner of the Indian Territory and in the southeastern corner of Kansas. In the 1818 treaty the Quapaws received a perpetual annuity, and in the 1824 treaty this was "supplemented" by a limited annuity to run only for eleven years. In the 1833 treaty the tribe gave up both annuities in return for a 20-year annuity. The 1833 treaty provided considerably more in the way of goods and services for the Quapaws than had the 1824 treaty. We can only suppose and therefore conclude, in the light of the record, that the Government considered the consideration passing from the tribe to it to have been most adequate, that is, the Caddo lands in Oklahoma and the giving up of the perpetual annuity.

In view of all the circumstances surrounding the negotiation of the 1833 treaty and the 1824 treaty, and the actual terms of the two treaties, we agree with the Commission that the two treaties were separate and distinct and that the 1824 treaty was in all material respects completely executed by the time the 1833 treaty was entered into. We accordingly affirm the Commission's conclusion that only the sum of $28,037 may be regarded as the consideration paid for the reserve lands (under the 1824 treaty) ; and we agree with the Commission that such consideration was unconscionable in view of the true value of the land which the Commission found to have been $987,092. This finding and conclusion of the Commission are, in our opinion, fully supported by substantial evidence.

### Offsets

Section 2 of the Indian Claims Commission Act makes the following provision respecting offsets:

"In determining the quantum of relief the Commission shall make appropriate deductions for all payments made by the United States on the claim, and for all other offsets, counterclaims, and demands that would be allowable in a suit brought in the Court of Claims under section 145 of the Judicial Code (36 Stat. 1136; 28 U.S.C. sec. 250), as amended; the Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant, except that it is hereby declared to be the policy of Congress that

monies spent for the removal of the claimant from one place to another at the request of the United States, or for agency or other administrative, educational, health or highway purposes, or for expenditures made prior to the date of the law, treaty or Executive Order under which the claim arose, or for expenditures made pursuant to the Act of June 18, 1934 (48 Stat. 984), save expenditures made under section 5 of that Act, or for expenditures under any emergency appropriation or allotment made subsequent to March 4, 1933, and generally applicable throughout the United States for relief in stricken agricultural areas, relief from distress caused by unemployment and conditions resulting therefrom, the prosecution of public work and public projects for the relief of unemployment or to increase employment, and for work relief (including the Civil Works Program) shall not be a proper offset against any award."

In determining what amounts expended by the United States on behalf of appellant-tribe should be allowed as offsets, the Commission has sought to apply the provisions of the Indian Claims Commission Act set forth above, this court's rule in the case of Sioux Tribe v. United States, 64 F.Supp. 312, 105 Ct.Cl. 725,[4]

and the rules suggested by this court in The Menominee Tribe of Indians v. United States, 118 Ct.Cl. 290.[5]

We have examined the items disallowed as offsets by the Commission and in each instance we agree with the disposition made by the Commission.

---

4. 64 F.Supp. at page 327, 105 Ct.Cl. at page 793 this court said:
"\* \* \* An expenditure by the Government, in order to be a gratuity or a legal or equitable offset chargeable against the Indians, must be one with respect to which the United States has not assumed any obligation, direct or incidental, as a party to the treaty or in its sovereign capacity pursuant to the intention of the treaty."

5. In the Menominee case (118 Ct.Cl. at page 326), the court held that expenditures for maintenance of law and order and for transportation for that purpose were primarily in the category of "agency and other administrative" expenses; that "education" included adult education such as that given by teachers of farming and by agricultural agents, and that

expenses of such nature should not to be set off; that in the absence of any showing as to just what was the purposes of the expenditures for planting and harvesting crops, seeds, fruit trees, fertilizers, agricultural implements and equipment, the court would assume that they were for the purpose of demonstration and were educational; that the same would apply to items for feed and care of livestock, transportation of livestock, transportation of supplies for agricultural aid and of agricultural implements and equipment; that the Government has the burden of proving the propriety of the offsets asserted and when an item, on the basis of the evidence submitted, may or may not have been expended for one of the purposes for which offsets cannot be made, the doubt must be resolved against the offset.